Debra L. Wabnik (dw-2468)
Stagg Wabnik Law Group LLP
401 Franklin Avenue, Suite. 300
Garden City, New York 11530
(516) 812-4550
dwabnik@staggwabnik.com
*Attorneys for Plaintiff*
Chadwick Troeger

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
CHADWICK TROEGER,

              Plaintiff,

      -against-

JETBLUE AIRWAYS CORPORATION, WILLIAM
PETERSEN and WAYNE MAYERS, JR.,

              Defendants.
-----------------------------------------------------------------------X

Civil Action No.: 23-cv-10859

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Chadwick Troeger ("Plaintiff"), by and through his attorneys, Stagg Wabnik Law Group LLP, complaining of Defendants JetBlue Airways Corporation ("JetBlue"), William Petersen ("Petersen"), and Wayne Mayers, Jr. ("Mayers") (collectively referred to as "Defendants"), herein alleges as follows:

**NATURE OF THE ACTION**

1.     Plaintiff, a JetBlue pilot, was subjected to a campaign of unrestrained harassment and other maltreatment by Defendants when they learned he was gay. Defendants forced Plaintiff to go to a Christian conversion center masquerading as a rehabilitation facility, which he could not leave until he stated he was no longer was gay. He also had to state that he accepted God to leave the facility, even though he is an atheist, in violation of his religious rights. When Defendants

1

finally let Plaintiff come home, they forced Plaintiff to attend meetings where he had to reaffirm a commitment to God which he did not believe.  Plaintiff was forced to endure excessive drug testing and repeated harassment to which no heterosexual, religious employees were subjected. Defendants failed and refused to address Plaintiff's complaints of harassment and discrimination, and retaliated against him after he reported it.

2.     Defendants' actions violated the New York State Human Rights Law, New York State Executive Law § 296, et seq. ("NYSHRL"), and the New York City Human Rights Law, New York City Administrative Code § 8-502(a), et seq. ("NYCHRL").  Defendants' conduct was willful and wanton and showed a reckless disregard for Plaintiff and the laws prohibiting harassment, discrimination and retaliation, which caused and continues to cause Plaintiff to suffer substantial economic and compensatory damages, including severe mental anguish and emotional distress and attorneys' fees.  Due to the egregious nature of Defendants' actions, Plaintiff is also entitled to punitive damages.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over the action pursuant to 28 U.S.C. § 1332 in that Plaintiff is a resident of the State of Texas and Defendants are residents of Florida and Delaware, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

4.     Pursuant to 28 U.S.C. § 1367, this Court has jurisdiction over the New York State and New York City claims by way of supplemental jurisdiction.

5.     Venue is proper in this District pursuant to Title 28 U.S.C. § 1391(b) and (c) as Plaintiff's claims arose within this District.

6.      Pursuant to NYCHRL § 8-502, Plaintiff will serve a copy of this Complaint upon the New York City Commission on Human Rights and the Corporation Counsel of the City of New York within ten days of its filing, thereby satisfying the notice requirements of this action.

## PARTIES

7.      Plaintiff is a resident of the State of Texas, County of Harris.  At all times relevant herein, Plaintiff was an employee of JetBlue.

8.      JetBlue is a Delaware corporation doing business in the State of New York.

9.      JetBlue is a commercial airline that provides both national and international flights to the public.

10.      JetBlue is an employer under the NYSHRL and NYCHRL.

11.      Plaintiff was hired by JetBlue as a commercial pilot on March 21, 2018.

12.      Plaintiff was an employee of JetBlue within the meaning of the NYSHRL and the NYCHRL.

13.      As a commercial pilot for JetBlue, Plaintiff was a member of the JetBlue Air Line Pilots Association ("JetBlue ALPA"), JetBlue's Pilots union, which is a chapter of ALPA, International.

14.      JetBlue ALPA Human Intervention Motivation Study ("HIMS") Program is a program administered by ALPA HIMS National. Funding for the program is provided by JetBlue.

15.      Petersen is an individual residing in the State of Florida. At all times relevant herein, Petersen was and is employee of JetBlue and acted as the JetBlue ALPA HIMS committee chairman.

16.      Mayers is an individual residing in the State of Florida. At all times relevant herein, Mayers was an and is employee of JetBlue and a Base Chief Pilot assigned as Plaintiff's supervisor.

## STATEMENT OF FACTS

### *Defendants Force Plaintiff Into A "Treatment" Facility Because He Is Gay*

17.     Plaintiff was issued a tablet by JetBlue to use in the performance of his duties.

18.     Pursuant to JetBlue's collective bargaining agreement with its pilots, Plaintiff was permitted to use his JetBlue-issued tablet for personal use.

19.     The collective bargaining agreement prohibits JetBlue from "access[ing] or monitor[ing] a Pilot's personal files, information or browsing history on their Company provided computer/tablet."

20.     On or about February 18, 2020, data from Plaintiff's family's private iCloud account was accessed without authorization by JetBlue employee Jason Hoffman ("Hoffman") from a tablet Plaintiff had used previously. The personal data accessed included, but was not limited to, Plaintiff's banking information, gay pornography, and browsing history.

21.     On or about February 19, 2020, Hoffman provided the personal data he had accessed to Petersen without Plaintiff's consent.

22.     On February 19, 2020, Petersen, acting in his capacity as the ALPA JetBlue HIMS Chairman, contacted Plaintiff regarding the personal data he received from Hoffman. Petersen stated to Plaintiff that the personal data that he believed to be Plaintiff's included pornography.

23.     Plaintiff stated he did not want any further contact from Petersen.

24.     Petersen persisted in repeatedly calling Plaintiff, stating Plaintiff needed to put the situation behind him.

25.     On February 22, 2020, Plaintiff reported to John F. Kennedy Airport to work his scheduled trip as a pilot for JetBlue. In the gate area, Jacob Browning ("Browning"), an assistant

Chief Pilot for JetBlue, physically prevented Plaintiff from boarding his assigned flight. Browning took Plaintiff to a conference room where Petersen and Kingston were waiting.

26.     Petersen and Kingston put screenshots of personal data from Plaintiff's family's account on a large screen in the conference room. Plaintiff recognized some of the private data as belonging to his personal cell phone.

27.     Plaintiff also recognized some personal data as belonging to his mother. There was also personal electronic data that Plaintiff had never seen before.

28.     Plaintiff was shown screenshots of gay pornography that Petersen stated he believed belonged to Plaintiff.

29.     Petersen also stated that web searches had been conducted into the half-life of illicit drugs.  However, Plaintiff had merely read peer reviewed medical articles which were no basis for concern.

30.     Plaintiff had no criminal record for drugs or anything else, nor any history of substance abuse, including during the period he was a pilot.  Nonetheless, Petersen threatened to discharge Plaintiff unless he agreed to go to a medical evaluation at Cornerstone of Recovery ("Cornerstone"), a purported addiction treatment center in Tennessee.

31.     Petersen told Plaintiff the medical evaluation would only be two days and he would be home on Tuesday, February 25, 2020.

32.     The meeting put Plaintiff under extreme emotional distress and mental suffering, which compounded the stress he already felt after Petersen's prior harassment of Plaintiff with his repeated telephone calls.  Accordingly, he agreed to the evaluation.

33.     Plaintiff, Petersen and Kingston walked from the conference room to Browning's office. Under the direction of Petersen, Browning booked Plaintiff a ticket to Knoxville, Tennessee from Newark Airport for the following day to attend a medical evaluation at Cornerstone.

34.     Plaintiff insisted he was not a person with a substance use disorder and requested to take a company-approved urine drug screen to clear his name at that time. Browning refused.

35.     Plaintiff was in such mental anguish and emotional distress due to Petersen's actions he was unable to sleep the night of February 22, 2020.

36.     On February 23, 2020, Plaintiff reported to Newark Airport for his flight to Knoxville, Tennessee. Upon arriving at the Knoxville Airport, Plaintiff was met by a staff member from Cornerstone and transported by that staff member's personal vehicle to Cornerstone.

***Defendants and the Facility Manipulate Plaintiff To Keep Him In "Treatment"***

37.     When Plaintiff arrived at Cornerstone, he was treated as if he was incarcerated.  His belongings were confiscated, including his cell phone.  He was told he would not have access to his cell phone until the end of a five-day evaluation. This was contrary to Petersen's misrepresentation that he was going to a two-day evaluation.

38.     Plaintiff was then strip searched and forced to submit to a urine drug screen. Plaintiff was remanded to a room and was not able to leave the floor.  He was not allowed to contact his friends or family except for allotted time in the evening where one wall telephone was made available to all 15-25 residents of each floor.

39.     Plaintiff was informed if he left Cornerstone, he would face loss of employment at JetBlue for not completing the medical evaluation.

40.     During the booking process, Plaintiff was forced under duress and over his specific stated objection to sign a release of his medical information for Kent Jackson (JFK Chief Pilot),

Browning, Petersen, Captain Frank Lennon ("Lennon") (JetBlue ALPA HIMS Vice Chairman) and Kingston. The staff at Cornerstone told Plaintiff that if he did not sign the release, he would not be in compliance with the evaluation procedures and could face loss of employment with JetBlue.

41.    Plaintiff was again unable to sleep the night of Sunday, February 23, 2020.

42.    Cornerstone began its "medical evaluation" of Plaintiff on February 24, 2020. The evaluation consisted of multiple interrogation style interviews about his personal life, substance use, family history, sexual orientation, religion, and sexual history, among other things. Plaintiff was led to believe that if he did not answer these questions, he would be deemed as not complying with the evaluation which could lead to loss of employment with JetBlue.

43.    Plaintiff was given a PeTH Blood Alcohol Test.  He was also given a hair follicle test, even though a positive hair follicle test is not diagnostic criteria for a substance use disorder in the DSM or in the Federal Aviation Regulations.

44.    This harassment continued Plaintiff's extreme mental anguish and emotional duress. Due to this, Plaintiff was unable to sleep the night of February 24, 2020.

45.    On Wednesday, February 26, 2020, Plaintiff met with Dr. Lane Cook, Chief of Psychiatric Services for Cornerstone. Dr. Cook noted a tremor in Plaintiff's hands. Plaintiff never had tremor of his hands before this event. The tremor continued uncontrollably until December 2020.

46.    Dr. Cook prescribed Plaintiff trazadone for sleep upon learning that as of February 26th that Plaintiff had not slept in 96 hours.

47.    During Plaintiff's evaluation period at Cornerstone, he was required to attend group classes with other patients.

7

48.     From his check in to Cornerstone on February 23, 2020, until the end of the evaluation on February 28, 2020, Plaintiff's blood pressure and heart rate were taken multiple times. Each time, his blood pressure was in the range of 130/90, and his beats per minute were over 100. Plaintiff could not quench his thirst during the entire week. These symptoms were all caused by the extreme mental anguish and emotional duress he was suffering.

49.     During Dr. Cook's evaluation of Plaintiff, he noted he did not see any evidence of a substance use disorder, a pornography addiction or any other mental condition. He stated that he "hoped the hair test came back negative" in the report.

50.     At no time during the evaluation did Plaintiff discuss drinking alcohol with any Cornerstone staff, nor did they express concerns with alcohol use.

51.     The PeTH Alcohol blood test came back negative. A PeTH test has a two to three week look back for the presence of alcohol consumption. The hair test, which has a three to six month look back for alcohol, was also negative.

52.     On February 28, 2020, at the conclusion of the evaluation, staff at Cornerstone met with Plaintiff without a medical professional present and stated they were recommending treatment for Plaintiff due solely to a positive hair test for amphetamines.  Plaintiff had not taken any amphetamines.  False positives are possible for amphetamines when certain antihistamines, nasal sprays or cold medicines are consumed and for other reasons.  Since the hair test went back at least 90 days, it is entirely possible Plaintiff took one of these medications when he was not working. Nonetheless, the staff stated Plaintiff had been diagnosed with Amphetamine Type Use Disorder – Moderate.

53.     Even though Plaintiff's PeTH Alcohol blood test and alcohol hair test came back negative, they also diagnosed Plaintiff with Alcohol Type Use Disorder – Moderate.

54.     Cornerstone's staff pressured Plaintiff to enter a 28-day treatment immediately. Plaintiff declined since he did not have an amphetamine or alcohol issue.  Afraid to contradict Cornerstone's employees who had repeatedly threatened to discharge from his job, Plaintiff explained he had packed for a two-day stay, not 28 days.

55.     Cornerstone staff continued to pressure Plaintiff into entering treatment that date, stating multiple times that he would get credit for the prior five days, and would only need to serve an additional 23 days.

56.     Cornerstone's intentional misdiagnoses made Plaintiff's Federal Aviation Act ("FAA") pilot medical, which he needed to maintain his pilot's license, null and void. This added to Plaintiff's extreme mental anguish and emotional duress and left him with no viable options.

57.     Upon information and belief, Cornerstone had a financial interest in misdiagnosing Plaintiff and other JetBlue pilots with a substance use disorder as it receives a cash payment from JetBlue for treating its pilots.

58.     Plaintiff returned home to New York City on February 28, 2020 to prepare for his forced and unnecessary stay Cornerstone.

59.     While home, Plaintiff received continued unwarranted contact from Kingston and Petersen in an effort to keep him in fear of losing his license and career. Plaintiff expressed concern over his personal cellular data and his family's private electronic data being improperly accessed. Kingston and Petersen refused to address the issue, saying it did not matter because he was an addict.

60.     Plaintiff asked Kingston to be treated at a facility other than Cornerstone. Plaintiff stated he believed Cornerstone was unprofessional and biased. Kingston stated there were other options and he would get back to him.

61.    Kingston telephoned Plaintiff on Saturday, February 29, 2020 and stated the other facilities did not have openings.  Kingston stated to Plaintiff that he needed to return to Cornerstone and reiterated that Plaintiff would get credit for the five days of the evaluation and would only need to return for 23 days.

***At The Facility, Plaintiff is Further Discriminated Against
Due to his Sexuality and his Religious Beliefs Are Violated***

62.    Cornerstone is a 12-step/Alcoholics Anonymous/Narcotics Anonymous treatment facility.  Compliance with the 12-step program is required to complete treatment. Plaintiff was forced under duress of loss of employment to participate in the 12-step treatment plan.

63.    More than half of the 12 steps are religious or spiritual in nature and mimic Christian beliefs. For example, Cornerstone makes the treatment participants state they:

- Came to believe that a Power greater than ourselves could restore us to sanity.
- Made a decision to turn our will and our lives over to the care of God as we understood Him.
- Admitted to God, to ourselves, and to another human being the exact nature of our wrongs.
- Were entirely ready to have God remove all these defects of character.
- Humbly asked Him to remove our shortcomings.
- Sought through prayer and meditation to improve our conscious contact with God, as we understood Him, praying only for knowledge of His will for us and the power to carry that out.
- Having had a spiritual awakening as the result of these Steps, we tried to carry this message to alcoholics, and to practice these principles in all our affairs.

64.    The 12-Step program also states that "For our group purpose there is but one ultimate authority – a loving **God as He may express Himself** in our group conscience." (emphasis added).

65.    The entire time at Cornerstone, Plaintiff was allowed no reading material except the Bible, the Big Book of Alcoholics Anonymous and the Narcotics Anonymous Book.

66.     Cornerstone required its patients to state they were powerless over addiction.  When Plaintiff said he was not powerless over any addiction, Cornerstone extended Plaintiff's stay from 23 to 28 days.

67.      When Plaintiff asked Cornerstone for his discharge date, they would not give him one.

68.     Plaintiff stated he was an atheist and did not believe in a higher power. Regina Healey, Plaintiff's individual counselor at Cornerstone, asked Plaintiff about his sexual orientation. When Plaintiff responded that he was gay, his stay was extended from 28 days to 33 days.

69.     Plaintiff became even more distressed that he would not be released from Cornerstone.  The staff told Plaintiff he could be made to stay up to 90 days inpatient, then have to stay in the Knoxville area at an outpatient facility another 90 to 120 days if they recommended. Plaintiff was told that if he left without Cornerstone's consent, he could face loss of employment with JetBlue.

70.      Under extreme duress and desperate to leave, Plaintiff succumbed and stated that he was heterosexual, believed in God, and was powerless over his purported addictions, none of which were true. Plaintiff pretended these were his beliefs for the rest of his time at Cornerstone to placate the staff. With this change in position, Healey gave Plaintiff a release date of April 5, 2020, 34 days after returning to treatment, and 39 total days at Cornerstone.

71.     On or about March 19, 2020, Plaintiff met with Petersen and Kingston via Zoom for Plaintiff's HIMS "Back to Work Conference." During the meeting, Petersen discussed confidential medical information he had received from Cornerstone regarding an American Airlines pilot. Petersen is not an employee of Cornerstone nor is he a medical professional, should

11

not have been given the private and confidential information of other patients at the facility, and should not have shared that information with Plaintiff.   Plaintiff became even more anxious and depressed knowing that Petersen had private medical information about Plaintiff from Cornerstone.

***Defendants Continue to Violate Plaintiff's Religious Rights And***
***Discriminate Against Him After He is Released from the Facility***

72.     Plaintiff was discharged from Cornerstone on April 5, 2020.  He was given aftercare instructions from Cornerstone which were nonnegotiable.   The FAA requires whatever treatment the provider deems appropriate to be complied with for the FAA to approve medical recertification for a pilot and therefore Plaintiff had to comply to ever fly again.

73.     Plaintiff was assigned to Bridge Back to Life in Brooklyn, New York for his aftercare. Plaintiff was required to attend two relapse prevention meetings a week indefinitely until the FAA removed that requirement.

74.     JetBlue HIMS, as standard of care for all pilots with a substance use disorder, immediately placed Plaintiff into a random drug and alcohol testing program. Plaintiff was required to check his phone every morning for a text message notifying him to report to a drug/alcohol testing facility that day.

75.     The FAA requirement is 14 drug screens in a 12-month period.  Plaintiff was continuously subjected to more than the required drug screens.  Upon information and belief, heterosexual, religious employees were not subject to the additional testing.

76.     Plaintiff was also required to attend JetBlue's JFK HIMS monthly meetings. The meetings were run by Petersen. At the meetings, Plaintiff was forced to speak about his "recovery" from a substance use issue he did not have and his submission to a higher power he did not believe in, and other general themes of Alcoholics Anonymous.

12

77.     As part of the recertification process, Plaintiff was required to complete demanding psychological and psychiatric evaluations by an FAA certified psychologist and an FAA certified psychiatrist.

78.     Plaintiff met with Dr. Daniel DaSilva for his psychological testing and evaluation on July 14, 2020 and October 1, 2020.  Dr. DaSilva noted a tremor in Plaintiff's hand--a physical symptom of anxiety disorder. Dr. DaSilvia concluded there were some symptoms of early features of anxiety but no evidence of a disqualifying neurocognitive or psychological condition.

79.     Dr. Stuart Gitlow, FAA HIMS Psychiatrist, met with Plaintiff on February 8, 2021. Dr. Gitlow reviewed Plaintiff's FAA medical file along with his medical records from Cornerstone and Dr. DaSilva's Neuropsychological testing results.  Dr. Gitlow determined that Plaintiff did not meet the requirements under the Federal Aviation Regulations for substance abuse or substance dependence.

80.     Although Dr. Gitlow noted the positive hair follicle test at Cornerstone, he stated the test was not required by the Department of Transportation, or an agency of thereof, and therefore did not meet the regulatory requirements for substance abuse under the Federal Aviation Regulations. It also was not an approved drug test under JetBlue's employee handbook.

81.     Dr. Gitlow stated that on psychiatric evaluation Plaintiff had no condition that precluded him from further consideration for issuance of a first class medical certification. However, he diagnosed Plaintiff with General Anxiety Disorder due to the direct actions of Petersen, Kingston, and JetBlue.

82.     Per the FAA substance use disorder medical recertification process, Plaintiff was also forced to go to 90 meetings at Alcoholics Anonymous or Narcotics Anonymous in the first 90 days after discharge from inpatient treatment, or one meeting a day. After 90 days post

discharge, the requirement drops to 12 meetings a month. This continues indefinitely until the FAA removes the requirement.

83.     As an atheist who was uncomfortable with the explicitly theistic statements he was being required to make, Plaintiff requested a non-religious alternative to AA from Browning and Lennon during a July 2021 Zoom monthly HIMS meeting.  Lennon denied Plaintiff's request and called Plaintiff afterward expressing concern that he would make such a request.

84.     The first in-person JFK HIMS meeting occurred on September 9, 2021. There were approximately 30 pilots in attendance including JFK assistant Chief Pilot Eric Poole. At the end of the meeting, Petersen stated so that all other parties in the room could hear, "Chad [the Plaintiff], we will be having a separate meeting in the chief pilot's conference room with you now."

85.     A pilot in the HIMS program was also a JFK ALPA First Officer union representative. He demanded to attend the meeting.  They were led by Petersen to the JFK Chief Pilot's conference room, the same room where Plaintiff had been forced to attend a meeting with Petersen and Kington on February 22, 2020.

86.     At the meeting, Petersen harassed Plaintiff over what he had "going on," and why he had an attorney. Further, Petersen stated he heard Plaintiff had requested an alternative to AA and as a result he was concerned that Plaintiff was not fully invested in his recovery and therefore "not in full compliance with the program."

87.     Plaintiff felt he was once again being held against his will in this meeting. Petersen then falsely accused Plaintiff of doing drugs stating in front of everyone there, "Chad you had meth in your system, you were out doing meth."

88.     Plaintiff spent the next two years forced to continually lie about whether he had a substance abuse disorder and his belief in God, in order to maintain his pilot's license.  He was

14

under constant stress at having to do so, as well as at the barrage of random drug testing to which he was subjected.

89.    In April 2022, Plaintiff transferred to Fort Lauderdale, Florida and Base Chief Pilot Wayne Mayers ("Mayers") became his direct supervisor.  Mayers intensified the discrimination and harassment Plaintiff was already experiencing.

90.    On May 18, 2022, Plaintiff received an expanded random drug screening requested by JetBlue which was not authorized by his HIMS aviation medical examiner ("AME"), as required. The expanded panel included numerous over-the-counter antihistamines and other substances which Plaintiff is allowed to take.  Neither Plaintiff nor his AME were aware of the expanded testing until after it came back negative. The expanded screening is outside of the FAAs or JetBlue HIMS program's requirements.

91.    On November 17, 2022, Plaintiff received another expanded random drug screen requested by JetBlue and not authorized by his AME. Again, neither he nor his AME were aware the random drug screen was subject to this expanded panel until after it came back negative.

92.    Upon information and belief, heterosexual religious employees were not subjected to this expanded testing.

93.    On June 7, 2022, Plaintiff via his counsel Caitlyn Bates filed a discrimination and harassment complaint with Crew Relations, Mayers, Fort Lauderdale Assistant Chief Pilot Jessica Lowery and Chris Kenney, Executive Chairman of JetBlue ALPA regarding Mayers' and other ALPA HIMS/management members' actions toward Plaintiff as a gay, atheist male, throughout his time in the HIMS program.

94.    Defendants did not respond to Plaintiff's complaint.

95.     On December 6, 2022, Plaintiff took a rapid test Covid via telehealth which came back positive.  Accordingly, he removed himself from flight duty for December 7, 2022.  Plaintiff took a PCR test on December 7, 2022 which also came back positive.  Plaintiff's December 7th absence was coded as "CEL," JetBlue's code for "coronavirus employee leave," which is a non-punitive code that does not deduct from an employee's sick leave bank or factor into the company's attendance-monitoring regime.

96.     Over the next two weeks, Plaintiff continued to experience headache, cough, fatigue, and intermittent fevers exceeding 100 degrees Fahrenheit, all symptoms of an active Covid infection.  Therefore, on December 13, 2022, Plaintiff removed himself from duty for another 4-day trip scheduled to begin the next day.

97.     On December 14, 2022, Plaintiff emailed Mayers requesting clarification of the then-current company policy regarding recoding absences related to Covid. Plaintiff stated that he continued to test positive for COVID and experienced symptoms characteristic of an active Covid infection.  Mayers never responded.

98.     At a follow up telehealth visit on December 18, 2022, the doctor expressed concerns about the possibility of long-Covid infection, as Plaintiff was continuing to exhibit symptoms of brain fog and fatigue.

99.     Plaintiff's next assignment was scheduled for December 24, 2022.  Plaintiff slept through multiple alarms on his phone and alarm clock that day, causing him to miss his report time. Plaintiff was coded "Missed trip (M/T)" in the attendance-tracking system. Concerned that he was still suffering the effects of long-Covid, on that same date he contacted Dr. Nadin Salomon, an infectious disease specialist at Mt. Sinai Hospital in New York City.  Dr. Salomon ordered Plaintiff to be on bed rest through December 25, 2022.

100.    On December 25, 2022, Mayers sent Plaintiff an email stating Plaintiff's missed trip the day before triggered a dependability review and a review of his attendance before he had Covid.

101.    Mayers refused to recode Plaintiff's absences on December 14 and 24, 2022 as CEL even though heterosexual, religious pilots were being granted CEL under similar circumstances. Had the absences been designated as CEL, they would have been excluded from dependability review.  Further, as a result, these assignments were deducted from Plaintiff's PTO instead of being pay-protected pursuant to CEL policy.

102.    Heterosexual and religious pilots had been excused for up to 14 days of paid sick leave and were able to take CEL leave multiple times.  Plaintiff was only excused for 5 days total. Mayer claimed he was relying on Letter of Agreement 17 to the ALPA collective bargaining agreement to deny the leave, but that agreement did not provide a maximum date of leave for Covid.

103.    Based on the tone and content of Mayers' email, coupled with the continuing discriminatory conduct toward Plaintiff dating back to 2020, Plaintiff feared that if he did not report for his flight assignment on December 26, 2022, he would be subject to discipline and further discrimination.  Plaintiff felt compelled to report to work while still experiencing the symptoms of long-Covid.

104.    The December 26th trip began with a transcontinental flight from Fort Lauderdale to San Francisco. En-route from Fort Lauderdale to San Francisco, Plaintiff's Captain noticed Plaintiff had hives on his face.  Plaintiff's throat began to swell. Upon landing and exiting the plane, the swelling subsided and Plaintiff's face returned to a normal color. While he would have

normally removed himself from the rest of the trip, Plaintiff feared he would be sent back to Cornerstone and otherwise damaged.

105.    December 27th was the next leg of the trip from San Francisco to Boston. Approximately an hour after eating his JetBlue provided crew meal, Plaintiff's face again began to form hives, and his throat began to swell. Plaintiff fell unconscious. The Captain declared an emergency with air traffic control and made an emergency landing at Omaha Eppley Airfield.

106.    Upon landing, Omaha Fire EMS met the aircraft and transported Plaintiff by ambulance to the local emergency room. Plaintiff was treated for what was determined to be anaphylactic shock due to an allergic reaction.  The emergency room doctor stated that they had been seeing atypical anaphylactic reactions in patients infected with COVID in recent months. Plaintiff's Covid infection was a primary suspected factor leading up to the anaphylactic reaction.

107.    Plaintiff worried that he would have another anaphylactic reaction if he immediately flew home as a passenger, and would face further investigation and discipline. He therefore booked a hotel room with his own funds for two nights while he monitored his condition in accordance with his treating physician's orders.

108.    Feeling well enough to fly home December 29th, and armed with a prescribed epinephrine pen, Plaintiff flew home as a passenger from Omaha.

109.    No representative from JetBlue ever contacted Plaintiff to check on him.  Yet, they removed him from flight status using code RPI, Removed Pending Investigation. Plaintiff was never notified of his change in status.  He only learned of it when he logged onto his schedule.

110.    No healthcare professional involved in Plaintiff's care suspected drug/alcohol use or ordered any drug or alcohol testing.

111.    JetBlue's safety Department closed out its investigation completely, with no mention of any suspicion of alcohol or drug use.

112.    On January 24, 2023, Plaintiff was directed to take yet another random drug test. He reported to a location he did not know was no longer an approved testing location.  While there, Plaintiff was assaulted by the owner of the facility.  Plaintiff filed a police report and immediately notified Michelle Gable (JetBlue's designated testing program administrator), and his AME to ensure full compliance with the program and for guidance on where to get tested before close of business that day.  Plaintiff reported to an approved testing location that same day as instructed to provide a urine sample, the results of which were negative.

113.    JetBlue scheduled Plaintiff for a hair test the following day claiming he had a "missed test."  However, Plaintiff's AME informed him that he was in compliance so Plaintiff reasonably believed he fully satisfied his obligations.

114.    On February 8, 2023, the RPI was changed to "Suspended" with no notification to Plaintiff and no investigation conducted.  Plaintiff's pay was docked from the awarded pay of 78 hours and 86 hours of pay (for January and February respectively) to the minimum contractual pay of 70 hours. This was a loss of 10-15 hours a month as well as override pay such as international pay, redeye pay, segment modification pay, per diem, etc.  Plaintiff's override pay was previously an additional $2,500 to $4,000 per month.

115.    A week later, Plaintiff was told to attend a meeting on February 20, 2023 at the Fort Lauderdale base Chief Pilot's office.

116.    Plaintiff had scheduled PTO that day but still offered to attend via Teams.  Mayers insisted Plaintiff attend in person, which terrified Plaintiff. He was being told to attend a meeting

19

in person, which is how the atrocities committed against him by Defendants had begun.  The stress was too much, and Plaintiff could not attend.

117.    On March 8, 2023, JetBlue failed to pay Plaintiff his salary due.

118.    That same day was the quarterly in-person HIMS meeting in Florida.  It was the first meeting Mayers was to attend.  Plaintiff did not receive an invitation to the meeting.

119.    Plaintiff attempted to check the cockpit access security system ("CASS"), but his access had been cut off.  Plaintiff had an active medical and had not been notified that he was suspended or terminated, and therefore there was no basis for removing him from CASS.

120.    Plaintiff was informed by another pilot that a meeting invite was sent, but not to Plaintiff.

121.    On March 13, 2023, JetBlue discharged Plaintiff.  The termination letter stated Plaintiff had violated various sections of JetBlue's Crewmember Blue Book ("CBB") and Drug and Alcohol Policy ("DAP").

122.    The reasons provided for Plaintiff's discharge were clearly pretextual as the sections cited were either irrelevant to Plaintiff or factually inaccurate.  For example, the termination letter cited to CBB 2.9 (Obligations of Company Personnel) even though that section only applied to complaints of discrimination and harassment, not drug/alcohol monitoring programs, medical fitness for duty, safety matters related to inflight diversions, or employee attendance at meetings.

123.    Further, the letter stated that Plaintiff violated Section 2.5.4 of the DAP (Corporate Non-DOT Drug and Alcohol Testing Policy—Post Rehabilitation), even though Plaintiff submitted to an unreasonable and repetitive drug testing to which no heterosexual, religious JetBlue employee was subjected, and he was never tested under that section which applied to non-

DOT employees (which he was not) and was based on reasonable suspicion of drug or alcohol use (which never occurred).

124.    Plaintiff's career was ripped away from him simply because he was gay and an atheist.  Plaintiff has no other skills to fall back on, having dedicated his career to being a pilot.

125.    The emotional distress Plaintiff suffered due to Defendants' harassment and discrimination caused him Post Traumatic Stress Disorder and anxiety, and he has been prescribed medication.  As a result, Plaintiff may never be able to serve as a pilot again.

**AS AND FOR A FIRST CAUSE OF ACTION**
**AGAINST JET BLUE**
**(Hostile Work Environment Violation of New York Executive Law § 296 *et seq*.)**

126.    Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint as if more fully set forth herein at length.

127.    Executive Law § 296(1)(h) provides that: "It shall be an unlawful discriminatory practice…for an employer…to subject any individual to harassment because of an individual's…sexual orientation… …regardless of whether such harassment would be considered severe or pervasive under precedent applied to harassment claims…."

128.    Defendants discriminated against Plaintiff and created a hostile work environment because of Plaintiff's sexual orientation in violation of Executive Law § 296(1)(h) by persistent offensive and degrading conduct, which subjected Plaintiff "to inferior terms, conditions or privileges of employment because of" Plaintiff's sexual orientation.

129.    At Cornerstone and through the repetitive drug testing and HIMS meetings thereafter, Plaintiff was treated like a prisoner by Defendants.  He was deprived of his privacy and isolated from his family and friends.

130.     The forced confinement of Plaintiff at Cornerstone, the unnecessary repetitive drug testing, and the demeaning statements required of Plaintiff at the HIMS meetings was not to address any drug-related issue, as demonstrated by Cornerstone's own doctor's report which found no evidence of a substance disorder, pornography addiction or other mental condition. This finding was corroborated by the FAA certified psychologist and psychiatrist, both of whom found no addiction or psychological condition, other than that caused by Defendants' abusive conduct.

131.     The true purpose of sending Plaintiff to Cornerstone and subjecting him to repetitive drug tests and HIMS meetings was to eradicate him of his being gay and brainwash him to believe in God.

132.     Defendants created a hostile work environment for Plaintiff by harassing, embarrassing, and humiliating Plaintiff based on his sexual orientation and by failing to remedy the discrimination and harassment when Plaintiff complained.

133.     Defendants effectively blackmailed Plaintiff into complying with their unreasonable and discriminatory demands by holding his FAA clearance hostage.

134.     The treatment of Plaintiff was so severe and pervasive as to alter the terms and conditions of Plaintiff's employment.

135.     Based on the foregoing actions, Jet Blue, through its managers, supervisors, agents and policies, created a hostile work environment for Plaintiff because of his sexual orientation in violation of Executive Law § 296(1)(h).

136.     Plaintiff complained to Jet Blue about the harassment and discrimination he experienced, and Jet Blue failed to investigate, remedy or address the situation.

137.     As a direct and proximate result of Defendants' harassment and hostile work environment in violation of Executive Law § 296(1)(h), Plaintiff suffered, and continues to suffer,

monetary losses, including but not limited to loss of past and future income, compensation, and benefits, for which he is entitled to an award of monetary damages and other relief.

138.    As a direct and proximate result of Defendants' harassment and hostile work environment in violation of Executive Law § 296(1)(h), Plaintiff suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages.

139.    As a direct and proximate result of Defendants' unlawful and discriminatory actions in violation of Executive Law § 296(1)(h), Plaintiff is entitled to punitive damages, plus attorneys' fees and costs.

**AS AND FOR A SECOND CAUSE OF ACTION**
**<u>AGAINST JET BLUE</u>**
**(Sexual Orientation Discrimination in Violation of New York Executive Law § 296 *et seq*.)**

140.    Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint as if more fully set forth herein at length.

141.     Executive Law § 296(1)(a) provides that: "It shall be an unlawful discriminatory practice…for an employer…because of an individual's… sexual orientation…to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

142.    Plaintiff is gay and thus a member of a protected class under Section 296(1)(a).

143.    As set forth above, Defendants forced Plaintiff into Cornerstone and subjected him to unnecessary repetitive drug tests and HIMS meetings to eradicate him of his being gay and brainwash him into believing in God.

144.   Defendants refused to provide Plaintiff with leave provided to heterosexual employees; subjected Plaintiff to expanded drug testing not required of heterosexual employees; and reduced his compensation and ultimately terminated him because he was gay.

145.   Jet Blue ultimately discharged Plaintiff because of his sexual orientation, proffering reasons that were an obvious pretext for the discrimination.

146.   Based on the foregoing actions, Jet Blue discriminated against Plaintiff because of his sexual orientation in violation of Executive Law § 296(1)(h).

147.   As a direct and proximate result of Defendants' discrimination in violation of Executive Law § 296(1)(a), Plaintiff suffered, and continues to suffer, monetary losses, including but not limited to loss of past and future income, compensation, and benefits, for which he is entitled to an award of monetary damages and other relief.

148.   As a direct and proximate result of Defendants' discrimination in violation of Executive Law § 296(1)(a), Plaintiff suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages.

149.   As a direct and proximate result of Defendants' unlawful and discriminatory actions in violation of Executive Law § 296(1)(a), Plaintiff is entitled to punitive damages, plus attorneys' fees and costs.

### AS AND FOR A THIRD CAUSE OF ACTION
### AGAINST ALL DEFENDANTS
### (Sexual Orientation Discrimination in Violation of New York City Administrative Code § 8-107)

150.   Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint as if more fully set forth herein at length.

151.    New York City Administrative Code § 8-107(1) provides that: It shall be an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual or perceived … sexual orientation … of any person…to discharge from employment such person; or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

152.    As a direct and proximate result of Defendants' harassment and hostile work environment, and other actions of discrimination, including the discriminatory discharge, in violation of § 8-107(1) of the New York City Administrative Code set forth above, Plaintiff suffered, and continues to suffer, monetary losses, including but not limited to loss of past and future income, compensation, and benefits, for which he is entitled to an award of monetary damages and other relief.

153.    As a direct and proximate result of Defendants' harassment and hostile work environment, and other actions of discrimination, including the discriminatory discharge, in violation of § 8-107(1) of the New York City Administrative Code, Plaintiff suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages.

154.    As a direct and proximate result of Defendants' unlawful and discriminatory actions in violation of New York City Administrative Code § 8-107, Plaintiff is entitled to punitive damages, plus attorneys' fees and costs.

## AS AND FOR A FOURTH CAUSE OF ACTION
## AGAINST JET BLUE
### (Religious Discrimination in Violation of New York Executive Law §296(1)(a))

155.    Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint as if more fully set forth herein at length.

156.    Executive Law § 296(1)(a) provides that: "It shall be an unlawful discriminatory practice …[f]or an employer …, because of an individual's … creed … to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

157.    Plaintiff is an atheist and thus a member of a protected class under Section 296(1)(a).

158.    As set forth above, Defendants forced Plaintiff into Cornerstone and subjected him to unnecessary repetitive drug tests and HIMS meetings to eradicate him of his being gay and brainwash him into believing in God.

159.    Defendants refused to provide Plaintiff with leave provided to religious employees; subjected Plaintiff to expanded drug testing not required of religious employees; and reduced his compensation and ultimately terminated him because he was not religious.

160.    Defendants discriminated against Plaintiff in the terms and conditions of his employment based on religion by creating an intimidating, hostile and offensive work environment where atheists are forced to declare their allegiance to God and by holding religious employees in higher regard.

161.    Defendants committed numerous adverse acts against Plaintiff due to his being an atheist, including forcing him to repeatedly proclaim his belief in God, and terminating Plaintiff's employment.

26

162.   Defendants knew about the discrimination and harassment Plaintiff was suffering as a result of his religious beliefs—in part based on Plaintiff's complaints-- but failed to take any action to correct it.

163.   As a direct and proximate result of Defendants' harassment and hostile work environment, and other discriminatory actions, including the discriminatory discharge, in violation of Executive Law § 296(1)(a), Plaintiff suffered, and continues to suffer, monetary losses, including but not limited to loss of past and future income, compensation, and benefits, for which he is entitled to an award of monetary damages and other relief.

164.   As a direct and proximate result of Defendants' harassment and hostile work environment, and other discriminatory actions, including the discriminatory discharge, in violation of Executive Law § 296(1)(a), Plaintiff suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages.

165.   As a direct and proximate result of Defendants' unlawful and discriminatory actions in violation of Executive Law § 296(1)(a), Plaintiff is entitled to punitive damages, plus attorneys' fees and costs.

### AS AND FOR A FIFTH CAUSE OF ACTION
### AGAINST ALL DEFENDANTS
**(Religious Discrimination in Violation of New York City Administrative Code § 8-107)**

166.   Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint as if more fully set forth herein at length.

167.   NYC Administrative Code 8-107(1) provides that: It shall be an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual

or perceived … creed… of any person: employment such person; or (3) To discriminate against such person in compensation or in terms, conditions or privileges of employment."

168.    Plaintiff was treated less well and was marginalized, humiliated and discriminated against by Defendants because of his atheist beliefs.

169.    As a direct and proximate result of Defendants' harassment and hostile work environment, and other discriminatory actions, including the discriminatory discharge, in violation of NYC Administrative Code 8-107(1), Plaintiff suffered, and continues to suffer, monetary losses, including but not limited to loss of past and future income, compensation, and benefits, for which he is entitled to an award of monetary damages and other relief.

170.    As a direct and proximate result of Defendants' harassment and hostile work environment, and other discriminatory actions, including the discriminatory discharge, in violation of NYC Administrative Code 8-107(1), Plaintiff suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages.

171.    As a direct and proximate result of Defendants' unlawful and discriminatory actions in violation of NYC Administrative Code 8-107(1), Plaintiff is entitled to punitive damages, plus attorneys' fees and costs.

**AS AND FOR A SIXTH CAUSE OF ACTION**
**AGAINST ALL DEFENDANTS**
**(Retaliation in Violation of New York Executive Law § 296(7))**

172.    Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint as if more fully set forth herein at length.

173.    New York State Executive Law § 296(7) provides that it shall be an unlawful discriminatory practice: "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he has opposed any practices forbidden under this article."

174.    Plaintiff engaged in protected activity when he filed a complaint against Defendants for sexual orientation and religious discrimination.

175.    Defendants ignored Plaintiff's complaint and allowed the harassment and discrimination to continue.

176.    After Plaintiff reported the harassment and discrimination, Defendants retaliated by treating him even worse and ultimately discharged Plaintiff under the pretext that he violated company policies.

177.    As a direct result of Defendants' illegal acts, Plaintiff lost compensation and was forced to hire an attorney.

178.    As a direct and proximate result of Defendants' retaliation in violation of New York State Executive Law § 296(7), Plaintiff suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages.

179.    As a result of Defendants' illegal acts, Plaintiff is entitled to attorney's fees, costs, and punitive damages.

## AS AND FOR A SEVENTH CAUSE OF ACTION
## <u>AGAINST ALL DEFENDANTS</u>
### (Retaliation in Violation of New York City Administrative Code § 8-107(7))

180.    Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint as if more fully set forth herein at length.

181.    New York City Administrative Code § 8-107(7) provides that: "It shall be an unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has opposed any practice forbidden under this chapter."

182.    Plaintiff engaged in protected activity when he filed a complaint against Defendants for sexual orientation and religious discrimination.

183.    Defendants ignored Plaintiff's complaint and allowed the harassment and discrimination to continue.

184.    After Plaintiff reported the harassment and discrimination, Defendants retaliated by treating him even worse and ultimately discharged Plaintiff under the pretext that he violated company policies.

185.    As a direct result of Defendants' illegal acts, Plaintiff lost compensation and was forced to hire an attorney.

186.    As a direct and proximate result of Defendants' retaliation in violation of Section 8-107 of the New York City Administrative Code, Plaintiff suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages.

187.    As a result of Defendants' illegal acts, Plaintiff is entitled to attorney's fees, costs, and punitive damages.

**AS AND FOR AN EIGHTH CAUSE OF ACTION**
**AS AGAINST DEFENDANTS PETERSEN AND MAYERS**
**(Aiding and Abetting Discrimination in Violation of New York Executive Law § 296 *et seq*.)**

188.    Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint as if more fully set forth herein at length.

189.    Executive Law § 296(6) provides that: "It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter, or to attempt to do so."

190.    As detailed above, Plaintiff was subject to discriminatory, harassing and retaliatory conduct, up to and including Plaintiff's discharge.

191.    Petersen and Mayers actively participated in the discrimination, hostile work environment and retaliation through JetBlue.

192.    Petersen and Mayers knowingly and/or recklessly aided, abetted, incited, compelled, and coerced the unlawful employment practices and discrimination against Plaintiff in violation of Executive Law § 296(6).

193.    As a result of Petersen and Mayers' aiding and abetting JetBlue's willful, knowing, and intentional discriminatory and retaliatory conduct, Plaintiff suffered and continues to suffer monetary losses, including but not limited to loss of past and future income, compensation, and benefits, for which he is entitled to an award of monetary damages and other relief.

194.    Plaintiff also suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety,

loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages.

195.    As a direct and proximate result of Petersen and Mayers' unlawful and discriminatory actions in violation of Executive Law § 296(6), Plaintiff is entitled to punitive damages, plus attorneys' fees and costs.

**AS AND FOR A NINTH CAUSE OF ACTION
AGAINST DEFENDANTS PETERSEN AND MAYERS**
**(Aiding and Abetting in Violation of New York City Administrative Code § 8-107(6))**

196.    Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint as if more fully set forth herein at length.

197.    New York City Administrative Code § 8-107(6) provides that it shall be unlawful discriminatory practice: "For any person to aid, abet, incite, compel, or coerce the doing of any of the acts forbidden under this chapter, or attempt to do so."

198.    As a proximate result of Petersen and Mayers' aiding and abetting JetBlue's and each other's willful, knowing, and intentional discrimination and retaliation against Plaintiff, Plaintiff has sustained and continues to sustain substantial losses of earnings and other employment benefits.

199.    Plaintiff also suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages.

200.    Plaintiff suffered and continues to suffer monetary losses, including but not limited to loss of past and future income, compensation, and benefits, for which he is entitled to an award of monetary damages and other relief.

201.    Plaintiff is entitled to recover reasonable attorneys' fees and costs (including expert costs) in an amount according to proof.

202.    Petersen and Mayers' conduct constitutes malicious, willful, wanton, and/or reckless indifference to Plaintiff's protected rights, and this entitles Plaintiff to punitive damages.

**AS AND FOR A TENTH CAUSE OF ACTION**
**<u>AGAINST JETBLUE</u>**
**(Employer Liability For Discriminatory Conduct By Employees Pursuant to New York City Administrative Code § 8-107(13))**

203.    Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint as if more fully set forth herein at length.

204.    An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of subdivision one or two of New York City Administrative Code Section 8-107(13)(b) where (1) the employee or agent exercised managerial or supervisory responsibility or (2) the employer knew of the employee's or agents discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action; an employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct where that conduct was known by another employee or agent who exercised managerial or supervisory responsibility; or (3) the employer should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.

205.    JetBlue is liable for the unlawful discriminatory conduct and employment practices of Petersen and Mayers, including for the following separate bases for liability: discriminating against Plaintiff because of his sexual orientation and religious beliefs, creating a hostile work environment based on Plaintiff's sexual orientation and religious beliefs, retaliation and ultimately

terminating Plaintiff's employment in violation of Section 8-107(13) of the New York City Administrative Code.

206.    JetBlue is further liable for the unlawful discriminatory employment practices of Petersen and Mayers, who exercised managerial and supervisory responsibilities over Plaintiff.

207.    JetBlue knew, should have known, of the discriminatory, harassing and retaliatory conduct of Petersen and Mayers, and acquiesced in the discriminatory employment conduct.

208.    JetBlue failed to exercise reasonable diligence to prevent said discriminatory conduct of Petersen and Mayers against Plaintiff.

209.    As a proximate result of JetBlue's actions and inactions, Plaintiff has sustained and continues to sustain substantial losses of earnings and other employment benefits.

210.    As a proximate result of JetBlue's actions and inactions, Plaintiff has suffered and continues to suffer humiliation, emotional distress, and physical and mental pain and anguish.

211.    As a proximate result of JetBlue's actions and inactions, Plaintiff is entitled to compensatory damages.

212.    Plaintiff is entitled to recover reasonable attorneys' fees and costs.

213.    JetBlue's conduct constitutes malicious, willful, wanton, and/or reckless indifference to Plaintiff's protected rights, and this entitles Plaintiff to punitive damages.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that the Court grant judgment in his favor and against Defendants:

A.    Awarding Plaintiff damages in an amount to be determined at trial, plus pre-judgment interest, to compensate Plaintiff for all monetary and/or economic damages, including but not limited to, compensation for his severe mental anguish and emotional distress, humiliation, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, emotional pain and suffering and other physical and mental injuries;

B.    Awarding Plaintiff damages in an amount to be determined at trial, plus pre-judgment interest, to compensate Plaintiff for all monetary losses, including but not limited to loss of past and future income, compensation, and benefits, for which she is entitled to an award of monetary damages and other relief;

C.    Awarding Plaintiff damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff in an amount to be determined at trial, plus pre-judgment interest;

D.    Awarding Plaintiff punitive damages, in an amount to be determined at trial;

E.    Awarding Plaintiff costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law; and

F.    Awarding Plaintiff such other and further relief as the Court deems just and proper.

Dated: Garden City, New York
December 14, 2023

Stagg Wabnik Law Group LLP

By:  /s/Debra L. Wabnik
      Debra L. Wabnik (dw-2468)
*Attorneys for Plaintiff*
*Chadwick Troeger*
401 Franklin Avenue, Suite 300
Garden City, New York 11530
(516) 812-4550

35