UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHADWICK TROEGER,

　　　　　　　　　　　Plaintiff,

　　　　　　-v-

JETBLUE AIRWAYS CORP., *et al.*,

　　　　　　　　　　　Defendants.

23-CV-10859 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

　　This is an employment discrimination case brought by Chadwick Troeger against his former employer, JetBlue Airways Corp. ("JetBlue"), and former supervisor, William Petersen. Troeger asserts claims for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*; the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 296 *et seq.*; and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §§ 8-502(a) *et seq.* Before the Court are JetBlue's and Petersen's motions to dismiss the Second Amended Complaint. For the reasons that follow, the motions are granted in part and denied in part.

I.　　**Background**

　　A.　　**Factual Background**

　　The following factual allegations are drawn from the Second Amended Complaint and are presumed true for the purposes of resolving the present motions. *Fink v. Time Warner Cable*, 714 F.3d 739, 740-41 (2d Cir. 2013). Chadwick Troeger is a gay man, an atheist, and a former JetBlue commercial pilot. (*See* ECF No. 37 ("SAC") ¶¶ 71, 50, 2.) He was hired by JetBlue on March 21, 2018, and was "never cited for poor behavior or not being qualified for his position" while at the company. (*Id.* ¶ 2.) When he started, Troeger was based at John F. Kennedy

International Airport ("JFK") in New York.  (*See id.* ¶ 94.)  His direct supervisor was William

Petersen, "an employee of JetBlue," as well as "the Air Line Pilots Association ('JetBlue

ALPA') Human Intervention Motivation Study ('HIMS') committee chairman."  (*Id.* ¶ 12.)

JetBlue ALPA is JetBlue's pilots' union, a chapter of ALPA International.  (*Id.* ¶ 15.)  While at

JetBlue, Troeger was a member of the union.  (*Id.*)  The HIMS Program is "administered by

ALPA HIMS National" and funded by JetBlue.  (*Id.* ¶ 16.)

During the course of Troeger's employment, JetBlue issued him a tablet "to use in the

performance of his duties," though, per a collective bargaining agreement, Troeger "was

permitted to use his JetBlue-issued tablet for personal use."  (*Id.* ¶¶ 17-18.)  Around February 18,

2020, JetBlue employee Jason Hoffman accessed Troeger's family data from a tablet that

Troeger may have used previously, though Troeger raises the possibility that the tablet was used

by someone other than him.  (*Id.* ¶ 20.)  Hoffman gave the data—comprising Troeger's banking

information, gay pornography, and browsing history—to Petersen.  (*Id.* ¶¶ 20-21.)  Petersen

contacted Troeger repeatedly about the data, including the pornography, and informed him that

he would continue to track the tablet "through the JetBlue Chief Pilot's Office."  (*Id.* ¶¶ 22-26.)

On February 22, 2020, Troeger was attempting to board his scheduled trip at JFK when

he was physically stopped by Jet Blue assistant Chief Pilot Jacob Browning, who took Troeger to

a conference room where Petersen and Jet Blue First Officer and ALPA HIMS Committee

Member Michael Kingston waited.  (*Id.* ¶ 27.)  Petersen and Kingston confronted Troeger with

screenshots from the tablet, some of which Troeger recognized as from his personal cell phone,

"on a large screen in the conference room."  (*Id.* ¶ 28.)  Troeger recognized other parts of the

data as belonging to his mother, and some he did not recognize at all.  (*Id.* ¶ 29.)  Petersen

showed "screenshots of gay pornography that Petersen stated he believed belonged" to Troeger,

along with searches "into the half-life of illicit drugs" from "peer-reviewed medical articles written for academic pursuits." (*Id.* ¶¶ 30-31.)  Despite the fact that Troeger had no criminal record and no history of substance abuse, Petersen "threatened to terminate [Troeger's] employment unless he agreed to go to a medical evaluation at Cornerstone of Recovery ('Cornerstone'), a purported addiction treatment center in Tennessee." (*Id.* ¶ 32.)  Petersen, "under extreme emotional distress and mental suffering," "agreed to the evaluation," which he was told would last two days. (*Id.* ¶¶ 33-34.)  "Under the direction of Petersen, Browning booked [Troeger] a ticket to Knoxville, Tennessee from Newark Airport for the following day to attend a medical evaluation at Cornerstone." (*Id.* ¶ 35.)  When Troeger requested a drug test in order to clear his name, Browning refused. (*Id.* ¶ 36.)

The next day, Petersen texted Troeger "that he was talking to the JetBlue Chief Pilots regarding [Troeger's] situation and that if he did not go to a medical evaluation 'the company is going to get to the bottom of this somehow.'" (*Id.* ¶ 38.)  The same day, Troeger flew to Tennessee to attend his medical evaluation at Cornerstone, where "he was treated as if he [were] incarcerated." (*Id.* ¶¶ 39-40.)  Troeger was then told the evaluation would last five days, rather than the two originally promised by Petersen, and that he would not have access to his cell phone during that time. (*Id.* ¶¶ 33, 40.)  He was "strip searched and forced to submit to a urine drug screen," "remanded to a room and was not able to leave the floor," permitted limited access to his family and friends, and told that "if he left Cornerstone, he would face termination of his employment with JetBlue." (*Id.* ¶¶ 41-42.)  He was also required, over his objection and on threat of termination, to sign a release of his medical information for JFK Chief Pilot Kent Jackson, Browning, Petersen, and JetBlue ALPA HIMS Vice Chairman Captain Frank Lennon. (*Id.* ¶ 43.)  The process of speaking with Petersen and Browning, and traveling to Cornerstone,

caused Troeger significant stress that resulted in his not sleeping for multiple nights in a row, as well as hand tremors.  (*Id.* ¶¶ 37, 44, 47, 48.)

The next day, Cornerstone conducted an evaluation of Troeger that "consisted of multiple interrogation style interviews about his personal life, substance use, family history, sexual orientation, religion, and sexual history, among other things."  (*Id.* ¶ 45.)  Troeger was led to believe he would face termination for not answering the interview questions.  (*Id.*)  He was also administered a phosphatidylethanol ("PeTH") Blood Alcohol Test and a hair follicle test.  (*Id.* ¶ 46.)  His blood pressure and heart rate were measured multiple times during the five-day evaluation; both were elevated above normal ranges.  (*Id.* ¶ 51.)  And he "could not quench his thirst during the entire week" due to "extreme mental anguish and emotional duress."  (*Id.*) While the PeTH and hair follicle tests were negative for alcohol, Cornerstone staff informed Troeger that "they were recommending treatment . . . due to a positive hair test for amphetamines," though Troeger "had not taken any amphetamines," and false positives from that test are possible due to the use of common, over-the-counter medications.  (*Id.* ¶ 55.) "Nonetheless, the staff stated" that Troeger "had been diagnosed with Amphetamine Type Use Disorder – Moderate" and "Alcohol Type Use Disorder – Moderate."  (*Id.* ¶¶ 55-56.)

Troeger returned home on February 28, 2020, to prepare for an extended, involuntary stay at Cornerstone for treatment.  (*Id.* ¶ 61.)  Back in New York, Troeger received further communications from Petersen and Kingston, who dismissed Troeger's concerns about his privacy, "saying it did not matter because he was an addict."  (*Id.* ¶ 62.)   And when Troeger asked to be sent to a treatment facility other than Cornerstone, Kingston "stated that there were other options and [that] he would get back to him."  (*Id.* ¶ 63.)  But the next day, Kingston called

Troeger to inform him that "the other facilities did not have openings," and that he "needed to return to Cornerstone." (*Id.* ¶ 64.)

Back at Cornerstone, Troeger was required to participate in the Alcoholics Anonymous ("AA") "12-step treatment plan," which comprises steps that "are religious or spiritual in nature and mimic Christian beliefs." (*Id.* ¶¶ 65-66.) He was "allowed no reading material except the Bible, the Big Book of Alcoholics Anonymous and the Narcotics Anonymous Book," and was given no discharge date. (*Id.* ¶¶ 68, 70.) When he stated that he was an atheist and gay, his stay at Cornerstone was increased in length; ultimately, he stayed thirty-nine days. (*Id.* ¶¶ 71, 73.) While at Cornerstone, Troeger met remotely with Petersen and Kingston; during the meeting, "Petersen discussed confidential medical information he had received from Cornerstone regarding an American Airlines pilot," causing Troeger more anxiety when he realized that Petersen had his own information, as well as that of other patients at the facility. (*Id.* ¶ 74.)

After Troeger's discharge, and pursuant to Federal Aviation Administration ("FAA") regulations, JetBlue HIMS "immediately placed [Troeger] into a random drug and alcohol testing program," in which he "was required to check his phone every morning for a text message notifying him to report to a drug/alcohol testing facility that day." (*Id.* ¶ 77.) Though the FAA program requires fourteen drug screens in twelve months, Troeger, unlike "heterosexual, religious employees," was "continuously subjected to more than the required drug screens." (*Id.* ¶ 78.) Troeger was also required to attend monthly JetBlue HIMS meetings at JFK, which were usually run by Petersen. (*Id.* ¶¶ 79, 80.) In those meetings, he "was forced to speak about his 'recovery' from a substance use issue he did not have and his submission to a higher power he did not believe in." (*Id.*) Following the first HIMS meeting—which was led by Lennon, rather than Petersen—Lennon called Troeger multiple times a day to express concern

that Troeger "had not given himself to a higher power and that if he failed to do so he risked noncompliance and permanent revocation of his pilot medical." (*Id.* ¶¶ 80-81.) Also as part of the program, Troeger "was required to complete demanding psychological and psychiatric evaluations by an FAA certified psychologist and an FAA certified psychiatrist," which resulted in findings of no "disqualifying neurocognitive or psychological condition" or "substance abuse or substance dependence." (*Id.* ¶¶ 82-84.) When Troeger again requested a non-religious alternative to AA meetings to satisfy FAA requirements, Lennon denied the request "and called [Troeger] afterward expressing concern that he would make such a request." (*Id.* ¶ 88.)

At the end of the first in-person HIMS meeting on September 9, 2021, "Petersen stated so that all other parties in the room could hear, 'Chad[], we will be having a separate meeting in the chief pilot's conference room with you now.'" (*Id.* ¶ 89.) Another pilot in the HIMS program "demanded to attend the meeting," during which "Petersen harassed [Troeger] over what he had 'going on,' and why he had an attorney." (*Id.* ¶¶ 90-91.) Also in that meeting, Petersen expressed concern at Troeger's asking for a nonreligious alternative to AA and suggested that he "was not fully invested in his recovery and therefore 'not in full compliance with the program.'" (*Id.* ¶ 90.) Petersen then falsely stated, in front of everyone present, "Chad you had meth in your system, you were out doing meth." (*Id.* ¶ 92.) Troeger "spent the next two years forced to continually lie about whether he had a substance use disorder and his belief in God, in order to maintain his pilot's license." (*Id.* ¶ 93.)

In April 2022, Troeger was transferred from JFK to Fort Lauderdale, Florida, "in a desperate attempt to get away from Petersen and the hostile, discriminatory environment that he was subjected to" at JFK. (*Id.* ¶ 94.) His new supervisor in Fort Lauderdale was Base Chief Pilot Wayne Mayers, who "did not like that [Troeger] was challenging the religious aspect of the

HIMS meetings." (*Id.* ¶¶ 96, 99.)  On May 17, 2022, Troeger received an "expanded random toxicology screening requested by JetBlue which was not authorized by his HIMS aviation medical examiner ('AME') as required." (*Id.* ¶ 100.)  It came back negative. (*Id.*)

On June 7, 2022, Troeger filed through counsel a discrimination and harassment complaint with Crew Relations, Mayers, Fort Lauderdale Assistant Chief Pilot Jessica Lowery, and Executive Chairman of JetBlue ALPA Chris Kenney, "regarding Mayers' and other ALPA/HIMS JetBlue management members' actions toward [Troeger] as a gay, atheist male." (*Id.* ¶ 101.)  JetBlue did not respond to the complaint despite "internal policies" requiring it do so. (*Id.* ¶ 102.)  Soon after, Troeger missed a HIMS meeting, notifying Lowery of his absence. (*Id.* ¶ 103.)  Despite not being involved in HIMS or Troeger's medical clearance, Mayers "contacted [Troeger's] AME in an attempt to revoke Plaintiff's medical clearance, claiming [Troeger] had not attended a meeting and was not excused." (*Id.*)  As a result, Troeger "had to immediately speak to the AME's office," "provide proof of his compliance with the HIMS manual," and have "multiple phone calls with the AME's office." (*Id.* ¶ 104.)  When Troeger later that month approached Mayers to explain that his enrollment in HIMS was due to Petersen's discovery of gay pornography on his tablet, rather than drug addiction, "Mayers looked shocked and disgusted that [Troeger] would openly discuss homosexuality and immediately ended the meeting, motioning [Troeger] out of his office." (*Id.* ¶ 106.)  Almost immediately after the conversation, Troeger "received another expanded random drug screen requested by JetBlue and not authorized by his AME," which came back negative. (*Id.* ¶ 107.)  Based on his discussions with other pilots at JetBlue HIMS meetings, Troeger alleges that "heterosexual religious employees were not subjected to this expanded testing." (*Id.* ¶ 108.)

On December 6, 2022, Troeger tested positive for COVID-19, resulting in his absence from work being coded for coronavirus leave. (*Id.* ¶ 109.) He had symptoms for the following two weeks before emailing Mayers to ask for clarification about JetBlue's policy regarding COVID-19 leave. (*Id.* ¶¶ 110-11.) On December 24, 2022, Troeger missed a scheduled flight after sleeping through several alarms. (*Id.* ¶ 113.) The absence was coded as a "[m]issed trip," and, concerned about the effects of "long-Covid," Troeger contacted his physician, who ordered him on bed rest. (*Id.*) On December 25, 2022, Mayers emailed Troeger to inform him that the December 24 missed trip "triggered a dependability review and a review of his attendance before he had Covid." (*Id.* ¶ 114.) Mayers also refused to recode the missed trip, "even though heterosexual, religious pilots were being granted [coronavirus leave] under similar experiences" and thus were "excluded from dependability review." (*Id.* ¶ 115.) Mayers further informed Troeger that his absences would be deducted from his paid time off, basing the decision on an incorrect reading of the ALPA collective bargaining agreement. (*Id.* ¶ 116.)

Troeger reported for his December 26, 2022 flight from Fort Lauderdale to San Francisco, during the first leg of which Troeger experienced an allergic reaction that subsided upon landing. (*Id.* ¶ 118.) During the second leg of the trip, Troeger experienced a second allergic reaction, that time falling unconscious and requiring the plane to be diverted and Troeger to be transported to the emergency room. (*Id.* ¶ 119-20.) After that flight, Troeger was "removed . . . from flight status using code RPI, Removed Pending Investigation," but he was never notified of that change. (*Id.* ¶ 123.) The investigation closed "with no mention of any suspicion of alcohol or drug use." (*Id.* ¶ 125.)

On January 24, 2023, Troeger was required to take another random drug screening. (*Id.* ¶ 126.) "While there, [Troeger] was assaulted by the owner of the facility" and promptly "filed a

police report and immediately notified Michelle Gable (JetBlue's designated testing program administrator), and his AME to ensure full compliance with the program and for guidance on where to get tested." (*Id.*)  He reported to another facility to complete a urine test, which was negative, but JetBlue informed him the next day that he had missed the test and ordered a hair test.[1]  (*Id.* ¶¶ 126-27.)  One week later, he submitted to another random drug test, which was negative.  (*Id.* ¶ 127.)  On February 8, 2023, Troeger was suspended "with no notification to Plaintiff and no investigation conducted." (*Id.* ¶ 128.)  His pay was also reduced.  (*Id.*)

Troeger was later "told to attend a meeting on February 20, 2023 at the Fort Lauderdale base Chief Pilot's office." (*Id.* ¶ 129.)  "Mayers insisted [Troeger] attend in person," which Troeger refused as a result of his previous experiences with in-person meetings.  (*Id.* ¶ 130.)  He also submitted to, and passed, another random drug test on February 27, 2023.  (*Id.* ¶ 131.)  On March 8, 2023, Troeger did not receive his salary.  (*Id.* ¶ 132.)  He also did not receive an invitation to the quarterly in-person HIMS meeting scheduled for the same day after being told by another pilot that a link had been sent to join the meeting remotely.  (*Id.* ¶¶ 133, 135.)

On March 13, 2023, JetBlue terminated Troeger, citing violations of JetBlue's Crewmember Blue Book and Drug and Alcohol Policy.  (*Id.* ¶ 136).  Some of the policy sections cited in the termination letter were inapplicable to Troeger, such as one that "only applied to complaints of discrimination and harassment, not drug/alcohol monitoring programs, mental fitness for duty, safety matters related to inflight diversions, or employee attendance at meetings." (*Id.* ¶ 137.)  The letter also cited violations of the drug and alcohol policy.  (*Id.* ¶ 138.)

---

[1] Unlike every other drug test referenced in the Second Amended Complaint, Troeger does not allege whether he completed the second hair test or whether it was negative.

### B.    Procedural Background

Troeger brought this action for employment discrimination under Title VII, NYSHRL, and NYCHRL on December 14, 2023, naming JetBlue, Petersen, and Mayers as defendants. (ECF No. 1.)  He first amended his complaint on June 3, 2024, naming only JetBlue and Petersen as defendants.  (ECF No. 15).  JetBlue filed a motion to dismiss the amended complaint on July 15, 2024.  (ECF No. 29.)  Troeger amended his complaint a second time on August 23, 2024. (SAC.)  JetBlue filed a motion to dismiss the Second Amended Complaint on September 27, 2024 (ECF No. 40), along with an accompanying memorandum of law (ECF No. 41 ("JB Mem."))  and declaration (ECF No. 42).  Petersen filed a motion to dismiss the Second Amended Complaint on September 27, 2024.  (ECF No. 43 ("Petersen Mem.").)  On October 25, 2024, Troeger opposed JetBlue's motion (ECF No. 48 ("Opp. to JB")), as well as Petersen's (ECF No. 49 ("Opp. to Petersen")).  On November 8, 2024, JetBlue replied in further support of its motion (ECF No. 50 ("JB Reply")), as did Petersen (ECF No. 51 ("Petersen Reply")).

## II.    Discussion

### A.    Timeliness of Troeger's Federal Claims

JetBlue argues first that Troeger's federal claims are time-barred because he failed to file a statutorily required Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") within 300 days of most of the alleged illegal treatment, save for Troeger's termination.  (JB Mem. at 17-18.)  Troeger responds that his claims arising from treatment occurring before March 8, 2023, are nevertheless timely under the "continuing violation theory," "which allows for acts and claims outside the limitations period to be considered timely as long as one discriminatory act that comprises the employer's discriminatory practice is timely."  (Opp. to JB at 13.)

Prior to filing a Title VII claim, a New York plaintiff must file a Charge of Discrimination with the federal EEOC, or an equivalent state or local agency, within 300 days of the allegedly illegal employment action.  *See* 42 U.S.C. §§ 2000e-5(e)(1), (f)(1); *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 78-79 (2d Cir. 2015) (summarizing the statutory requirement as applied to New York employees).  Ordinarily, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).  However, the "continuing violation doctrine" makes actionable "specific and related instances of discrimination [that] are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice."  *King v. Aramark Servs. Inc.*, 96 F.4th 546, 559 (2d Cir. 2024) (quoting *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 713 (2d Cir. 1996)).  But "multiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation."  *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53 (2d Cir. 1993).

Categorizing allegations giving rise to a Title VII claim depends on the particular practices alleged.  For example, "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify.  Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'"  *Morgan*, 536 U.S. at 114.  Thus, Troeger's claims for discriminatory termination (and retaliatory termination) are timely, as they accrued during the limitations period.

 "Hostile environment claims," on the other hand, "are different in kind from discrete acts," since "[t]heir very nature involves repeated conduct."  *Id.* at 115; *see also King*, 96 F.4th at 559.  "As long as the employer has engaged in enough activity to make out an actionable hostile

work environment claim, an unlawful employment practice has 'occurred,' even if it is still

occurring," such that "[s]ubsequent events . . . may still be part of the one hostile work

environment claim and a charge may be filed at a later date and still encompass the whole."

*Morgan*, 536 U.S. at 117.

Importantly, though, the mere presence of a hostile work environment claim in a lawsuit

does not render every other Title VII claim timely simply because the alleged illegal act occurred

during the same time as the maintenance of a hostile work environment. *King*, 96 F.4th at 560.

That is because "an untimely discrete claim cannot be pulled into the limitations period by a

claim premised on a continuing course of conduct, even if the course of conduct includes that

discrete act." *Id.* ("For example, if a Title VII plaintiff lodges a timely hostile work

environment claim against an employer, the plaintiff cannot also lodge a separate claim for a

discrete failure to promote if the promotion denial fell outside the limitations period.")  The

allegedly illegal acts falling outside the limitations period may be "evidence to support the

hostile work environment claim," *id.* (emphasis omitted), but it is not itself actionable. *See*

*Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 220 (2d Cir. 2004).  "[T]he mere fact that an

employee was dismissed within the statutory period cannot be used to pull in a time-barred

discriminatory act, for continuity of employment, without more, is insufficient to prolong the life

of a cause of action for employment discrimination. *Id.* (cleaned up).  But if that discrete act,

"such as termination, [is] within the limitations period . . . it may . . . render a hostile work

environment claim timely *if it is shown to be part of the course of discriminatory conduct that*

*underlies the hostile work environment claim.*" *King*, 96 F.4th at 561 (emphasis in original).

That is true "*only* if the plaintiff establishes that the discrete act was part of the ongoing,

discriminatory practice that created a hostile work environment," for "[a]n unrelated discrete act,

different in kind from the conduct giving rise to the hostile environment, does not trigger the continuing violation doctrine." *Id.* (emphasis in original).

"Here, to establish a timely hostile environment claim," Troeger "must show a qualifying act no earlier than" March 8, 2023. *Cf. id.* The Second Amended Complaint alleges three such acts: (1) JetBlue's failure to pay Troeger on March 8, 2023; (2) JetBlue preventing Troeger from attending his quarterly in-person HIMS meeting, also on March 8, 2023; and (3) JetBlue terminating Troeger on March 13, 2023. (*See* SAC ¶¶ 128, 132-36.) Troeger alleges that all three of those decisions were motivated by discrimination on the basis of his sexual orientation and atheism. (Opp. to JB at 13-14.) Importantly, Troeger alleges that those actions were taken for the same discriminatory reasons—i.e., anti-gay bias stemming from the discovery of pornography on his tablet and generalized anti-atheistic bias—as were the actions taken before the commencement of the limitations period. Troeger characterizes the Second Amended Complaint as alleging "a three-year period of harassment and disparate treatment of Plaintiff based on his sexual orientation and religious beliefs which culminated in his discriminatory discharge." (Opp. to JB at 13.) Because Troeger's allegations of a hostile work environment allege the same fundamental form of discrimination—anti-gay and anti-atheistic bias manifested in discriminatory statements, compulsory religious practice, and testing requirements—masked by pretextual suspicions about Troeger's drug usage, "a jury could conclude that [Troeger's] termination was part of an ongoing discriminatory pattern or practice of sex-based [or religious-based] harassment." *Cf. King*, 96 F.4th at 562.

JetBlue's argument to the contrary, that *King* depended on the allegation of a single supervisor committing all of the allegedly discriminatory acts (*see* JB Reply at 7-8), reads that case too narrowly. True, the Second Circuit in *King* was satisfied that "a reasonable jury

viewing the facts in the light most favorable to" the plaintiff could conclude that an allegedly discriminatory supervisor was involved in the plaintiff's termination. *See King*, 96 F.4th at 562. But a work environment may be hostile even if pervasive discrimination comes from multiple supervisors acting independently, rather than one. After all, "[t]he Title VII framework often requires courts to consider the workplace conduct of multiple employees and supervisors in determining whether the plaintiff has experienced a hostile work environment." *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014) (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 77 (1998)). Because Troeger plausibly alleges pervasive anti-gay, anti-atheistic discrimination at JetBlue culminating in some discrete discriminatory actions that occurred during the limitations period, the Court concludes his Title VII hostile work environment claim is timely.

The relevant parties agree that the same analysis regarding the limitations period applies to Troeger's religious accommodation claim. (*See* JB Mem. at 18 n.5; Opp. to JB at 14.) "[A]n employer's rejection of an employee's proposed accommodation for religious practices does not give rise to a continuing violation." *Elmenayer v. ABF Freight Sys., Inc.*, 318 F.3d 130, 134-35 (2d Cir. 2003). Unlike hostile work environment claims, "[o]nce the employer has rejected the proposed accommodation, no periodic implementation of that decision occurs." *Id.* at 135. Contrary to Troeger's arguments for timeliness (*see* Opp. to JB at 14), "[a]lthough the *effect* of the employer's rejection continues to be felt by the employee for as long as he remains employed, the continued effect is similar to the continued effect of being denied a promotion or denied a transfer, denials that *Morgan* offered as examples of a discrete act." *Id.* (citing *Morgan*, 536 U.S. at 114). Because Troeger does not allege that any failure to accommodate occurred on or after March 8, 2020, the fifth cause of action is time-barred. JetBlue's motion to dismiss is

thus granted with respect to that claim. However, as Troeger points out, the Court's holding does not bar him from adducing evidence of JetBlue's alleged failure to accommodate his religious beliefs to support his timely claims. *See Petrosino v. Bell Atl.*, 385 F.3d 210, 220 (2d Cir. 2004).

### B.    Timeliness of Troeger's State and Local Claims

JetBlue and Petersen argue that Troeger's state- and local-law claims are untimely because he failed to satisfy those laws' three-year statute of limitations, which in this case permits claims arising from events occurring on or after December 14, 2020. (JB Mem. at 18; Petersen Mem. at 19-20.) "[B]ecause the Court has concluded that the continuing violation theory is applicable to the [alleged hostile work environment] at issue in this case in the context of Plaintiff's Title VII claim, the continuing violation doctrine is also applicable to Plaintiff's NYSHRL claim involving the same [allegedly hostile work environment]." *Montana v. City of Mount Vernon*, No. 21-CV-260, 2023 WL 8097039, at *10 (S.D.N.Y. Nov. 21, 2023). Moreover, the NYCHRL's continuing violation doctrine is even more permissive than Title VII's. *See Taylor v. City of New York*, 207 F. Supp. 3d 293, 302-03 (S.D.N.Y. 2016). Accordingly, Troeger's NYSHRL and NYCHRL claims are timely for the same reason that his federal claims are.[2]

---

[2] Contrary to Petersen's argument that "Petersen's alleged February 2020 conduct was not motivated by the same alleged conduct as his September 2021 actions" (Petersen Reply at 7), Petersen's sending Troeger to an explicitly religious institution in 2020 allegedly commenced the anti-atheistic hostile work environment to which Troeger was subjected. That is especially the case in light of the NYSHRL's and NYCHRL's more liberal standard for establishing both a hostile work environment and continuing violation.

### C.    Subject Matter Jurisdiction Over State and Local Claims

JetBlue argues next that this Court lacks subject matter jurisdiction over Troeger's NYSHRL and NYCHRL claims because Troeger has not adequately pleaded and proved that he was either a New York resident or that the allegedly discriminatory conduct had an impact within New York State and City.  (JB Mem. at 18-21.)  In particular, JetBlue argues that Troeger was transferred to Florida in April 2022 and currently resides in Texas, and that his allegation that he resided in New York between 2021 and 2023 "is highly questionable."  (*Id.* at 19-20.)  Troeger disagrees, arguing that "he resided in New York from Fall 2018 to February 2023." (Opp. to JB at 17.)

"New York State courts lack subject matter jurisdiction over claims brought under the NYCHRL and the NYSHRL by a non-resident plaintiff, when the alleged discriminatory conduct did not have an 'impact' on the plaintiff within New York City (regarding the NYCHRL) and within New York State (regarding the NYSHRL)."  *Kraiem v. JonesTrading Inst'l Servs. LLC.*, 492 F. Supp. 3d 184, 195 (S.D.N.Y. 2020) (citing *Hoffman v. Parade Publ'ns*, 15 N.Y.3d 285, 289 (2010)).  Where the basis for jurisdiction is "impact," it must be "felt *by the plaintiff* in" New York, rather than based on "tangential" contacts.  *See Vangas v. Montefiore Med. Ctr.*, 823 F.3d 174, 182-83 (2d Cir. 2016) (emphasis in original).  That rule governs this Court's exercise of subject matter jurisdiction as well.  *Kraiem*, 492 F. Supp. 3d at 199; *see also Jackson v. NYS Dep't of Labor*, 709 F. Supp. 2d 218, 224 (S.D.N.Y. 2010) (treating NYSHRL's and NYCHRL's election-of-remedies limitations as restricting a federal court's subject matter jurisdiction); *Williams v. City of New York*, 916 F. Supp. 2d 517, 520-21 (S.D.N.Y. 2013) (same).

As in all cases, "[t]he burden of proving jurisdiction is on the party asserting it." *Robinson v. Overseas Mil. Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994).  "When evaluating a motion to dismiss for lack of subject matter jurisdiction [over NYSHRL and NYCHRL claims],

the court accepts all material factual allegations in the complaint as true but does not necessarily draw inferences from the complaint favorable to the plaintiff." *Pedroza v. Ralph Lauren Corp.*, No. 19-CV-8639, 2020 WL 4273988, at *2 (S.D.N.Y. July 24, 2020); *see also Robinson*, 21 F.3d at 507 ("In determining whether a plaintiff has met this burden, we will not draw 'argumentative inferences' in the plaintiff's favor. We will, however, construe jurisdictional allegations liberally and take as true uncontroverted factual allegations." (citations omitted)).

On its face, the Second Amended Complaint contains contradictory allegations of fact regarding Troeger's residence in 2022 and 2023. First, Troeger alleges that "Plaintiff resided in New York, New York from approximately Fall 2018 to February 2023." (SAC ¶ 9.) Second, Troeger alleges that "in April 2022, Plaintiff transferred to Fort Lauderdale . . . denying him the chance to continue to live and work in" New York. (*Id.* ¶ 94.) Third, in the very next paragraph, Troeger alleges that though "Plaintiff rented an apartment in Florida for layovers," he "never intended that it would become his residence, nor did he consider it as such, always returning to New York as he intended and continued to reside in New York until February 2023." (*Id.* ¶ 95.)

The second allegation, that Troeger was denied the opportunity to live in New York as a result of the April 2022 transfer to Fort Lauderdale, contradicts the first and third allegations, that Troeger lived in New York the entire time. Where a complaint contains contradictory factual allegations, the Court is not obligated to accept them as true. *See Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir. 2005) (citing *Aziz Zarif Shabazz v. Pico*, 994 F. Supp. 460, 468-71 (S.D.N.Y. 1998) (Sotomayor, J.)). And even if the Court could concoct a series of inferences in favor of Troeger to resolve the inconsistency, such inferences are not to be drawn to overcome a motion to dismiss for lack of subject matter jurisdiction. *See Pedroza*, 2020 WL 4273988, at *2. And finally, the inconsistency notwithstanding, Troeger's conclusory statement that he

"continued to reside in New York" is supported by no factual allegations that the Court need accept as true.

Because the Second Amended Complaint does not make a plausible, uncontroverted allegation that Troeger resided in New York after his transfer to Fort Lauderdale in April 2022, and because the Court cannot make an "argumentative inference" on Troeger's behalf to resolve the inconsistency, it accepts as true only that Troeger resided in New York until April 2022.

It remains to determine whether, despite Troeger being a nonresident (including at the time he was terminated), JetBlue's alleged conduct had an "impact" on New York after April 2022. The Court concludes that it did not. Troeger does not make any factual allegation of an impact felt in New York following his transfer, other than that "New York was deprived of the contributions Plaintiff could make to New York." (Opp. at 18.) For that proposition, Troeger points to *Syeed v. Bloomberg, L.P.*, a recent case in which the New York Court of Appeals held that, "in discriminatory failure-to-hire or failure-to-promote cases," an employer's discriminatory action that . . . prevents a candidate from residing in New York . . . satisfies the impact test. 41 N.Y.3d 446, 450-51 (2024). Such a scenario is readily distinguishable, however, because in March 2023 JetBlue did not terminate Troeger from a position in New York State or City or fail to promote him into one. Instead, Troeger rests on his entirely "tangential," *cf. Vargas*, 823 F.3d at 182, plans to one day return, which are insufficient to satisfy the NYSHRL's and NYCHRL's jurisdictional requirements.

The Court holds, at this stage, assuming Troeger's not-contradicted factual allegations as true, that it has subject matter jurisdiction over the NYSHRL and NYCHRL claims only as to

employment actions occurring before April 2022.[3]  Accordingly, his termination in March 2023,

which occurred in Florida, is not actionable under either law, including under a theory of

retaliation.  Defendants do not make an argument that a limitations period ending in April 2022

fails to overcome the continuing violation doctrine's preservation of whatever remains of

Troeger's state- and local-law claims.

### D.    Motion to Dismiss Pursuant to Rule 12(b)(6)

Finally, JetBlue and Petersen argue that all of Troeger's claims are implausible and

should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).  Complaints in federal

court must "contain a 'short and plain statement of the claim showing that the pleader is entitled

to relief.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 677-68 (2009) (quoting Fed. R. Civ. P. 8(a)(2)).

Surviving a motion to dismiss, brought under Federal Rule of Civil Procedure 12(b)(6), for

failure to state a claim "does not require 'detailed factual allegations,' but it demands more than

an unadorned, the-defendant-unlawfully-harmed-me accusation.'"  *Id.* at 678 (quoting *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Each asserted claim must be "plausible on its

face," *id.* at 662, as "when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged."  *Lynch v. City of*

*New York*, 952 F.3d 67, 74 (2020) (quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678).  In

considering such a motion, the court must "accept all 'well-pleaded factual allegations' in the

complaint as true," *id.* at 74-75 (quoting *Iqbal*, 556 U.S. at 679), as well as "construe all

reasonable inferences that can be drawn from the complaint in the light most favorable to the

---

[3] Troeger has already twice amended his complaint, both times on notice of its
jurisdictional defects as a result of JetBlue's motions to dismiss.  Troeger is thus denied leave to
amend with respect to the jurisdictional requirements of NYSHRL and NYCHRL because the
Court determines that any such amendment would be futile.  *See Jackson v. Wells Fargo Home*
*Mortg.*, 811 Fed. App'x 27, 30 (2d Cir. 2020) (summary order).

plaintiff," *id.* at 75 (quotation marks omitted) (quoting *Arar v. Ashcroft*, 585 F.3d 559, 567 (2d Cir. 2009) (en banc)).  A plaintiff's "[l]egal conclusions," on the other hand, do not benefit from "the tenet that a court must accept as true all of the allegations contained in a complaint."  *Iqbal*, 556 U.S. at 678.

In the Second Amended Complaint, Troeger asserts fifteen causes of action against JetBlue and Petersen arising under Title VII, the NYSHRL, and the NYCHRL.[4]

### 1.  Title VII

JetBlue moves to dismiss the Title VII causes of action for sex and religious discrimination, arguing that Troeger has failed to plausibly allege facts showing either disparate impact or hostile work environment.  (JB Mem. at 23-30.)  JetBlue moves as well to dismiss the second, eleventh, and twelfth causes of action—for retaliation under Title VII, NYSHRL, and NYCHRL, respectively—arguing that Troeger has failed to allege causation between any employment action and his engagement in protected activity.  (*Id.* at 30-31.)

Title VII makes actionable certain forms of employment discrimination on the basis of sexual orientation and religious status, among other protected characteristics.  *See Bostock v.*

---

[4] At the outset, it is helpful to clarify that the actions of Cornerstone with respect to Troeger are not actionable under Title VII, NYSHRL, or NYCHRL.  "[T]he conduct of certain non-employees may be imputed to the employer where (1) the employer exercises a 'high degree of control over the behavior' of the non-employee, and (2) the employer's 'own negligence' permits or facilitates that non-employee's discrimination."  *Menaker v. Hofstra Univ.*, 935 F.3d 20, 38-39 (2d Cir. 2019); *see also Leroy v. Delta Air Lines*, No. 21-CV-267, 2022 WL 12144507, at *3 (2d Cir. Oct. 27, 2022) (amended summary order) (noting that *Menaker* extended Title VII's standard for non-employer liability to claims brought under the NYSHRL and NYCHRL).  Here, Troeger does not allege that JetBlue or Petersen exercised control, let alone a "high degree" of it, over Cornerstone or its employees.  Though Cornerstone's alleged anti-gay and anti-atheistic *positions* may be relevant to the intentions of JetBlue and its employees insofar as those defendants knew of them, Troeger has not carried his burden to impute Cornerstone's *actions* to the defendants in this case.

*Clayton County, Georgia*, 590 U.S. 644, 655, 683 (2020).  "[T]o defeat a motion to dismiss or a motion for judgment on the pleadings in a Title VII discrimination case, a plaintiff must plausibly allege that (1) the employer took adverse action against him, and (2) his race, color, religion, sex, or national origin was a motivating factor in the employment decision."  *Vega*, 801 F.3d at 87.  An adequate showing of the second element may be made either by plausibly alleging the four elements of a prima facie case of discrimination under the framework first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), "or by otherwise . . . identifying 'bits and pieces of evidence' that together give rise to an inference of discrimination."  *Vega*, 801 F.3d at 87 (quoting *Gallagher v. Delaney*, 139 F.3d 338, 342 (2d Cir. 1998)); *see also Buon v. Spindler*, 65 F.4th 64, 82-85 (2d Cir. 2023).

### a.    Disparate Treatment

As to the first and fourth causes of action for discrimination on the bases of sex and religion, the parties do not dispute that Troeger's sex and lack of religious beliefs place him within protected classes or that he was qualified for his position as a pilot.  Instead, JetBlue argues that "Plaintiff does not plausibly allege that any relevant JetBlue decision-maker terminated him, subjected him to any adverse employment action, or otherwise treated him less well due to his sexual orientation or his religious beliefs."  (JB Mem. at 23.)

No one argues that Troeger fails to allege any adverse employment action.  However, as Defendants insist Troeger has failed to do here, Title VII plaintiffs must plausibly allege "discriminatory motivation" for the particular adverse employment action(s) in question.  Thus, it is necessary to determine at the threshold what of JetBlue's alleged practices plausibly constitute adverse employment actions under Title VII.

"A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment." *Vega*, 801 F.3d at 85 (quoting *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)).  Troeger alleges five potential adverse employment actions: JetBlue's failure to pay him on March 8, 2023; his termination on March 13, 2023; his required attendance at Cornerstone under threat of termination; mandatory drug screenings "without medical, diagnostic, or treatment justifications"; and the requirement that he attend HIMS meetings that involved interrogation of his religious beliefs and sexual orientation.  (*See* SAC ¶¶ 128, 149, 151.)  Troeger's termination and reduction in pay, both of which fell within the limitations period, qualify.  *See Shultz v. Congregation Shearith Israel of City of N.Y.*, 867 F.3d 298, 304 (quoting *Galabya*, 202 F.3d at 640); *Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir. 2002).  The other three actions fall outside of the limitations period, and though they may serve as evidence of discriminatory motivation, as well as together form a claim for hostile work environment, they are not actionable as discrete adverse employment actions under Title VII.

That leaves the element of discriminatory motivation for Troeger's March 2023 pay reduction and termination.  "The burden of establishing a prima facie case of disparate treatment is not onerous," *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981), and is even less so on a motion to dismiss, where "a plaintiff must allege that the employer took adverse action against [them] at least in part for a discriminatory reason, and [they] may do so by alleging facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination." *Vega*, 803 F.3d at 87.  "An inference of discrimination can arise from circumstances including, but not limited to, 'the employer's criticism of the plaintiff's performance in [discriminatory] terms; or its invidious comments

22

about others in the employee's protected group; or the more favorable treatment of employees

not in the protected group; or the sequence of events leading to the plaintiff's discharge.'"

*Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015) (quoting *Leibowitz v. Cornell

Univ.*, 584 F.3d 487, 502 (2d Cir. 2009)).

Here, Troeger puts forward sufficient "bits and pieces of evidence" to raise a plausible

inference of intentional discrimination. *Cf. Vega*, 801 F.3d at 87. Specifically, he alleges that

Petersen contacted him about his use of a company-issued tablet to view gay pornography and

academic information about illicit drugs (SAC ¶ 20, 22); told Troeger he "needed to put the

situation behind him" (*id.* ¶ 24); contacted JetBlue's "Chief Pilot's Office" regarding the

situation (*id.* ¶ 26); and required Troeger to receive an evaluation and treatment from

Cornerstone, a religious organization opposed to homosexuality (*id.* ¶¶32, 72-73). Troeger

further alleges that JetBlue HIMS required additional drug screening to which "heterosexual,

religious employees were not subject" (*id.* ¶¶ 77-78), and that he was required to attend

meetings chaired by Lennon, who repeatedly called Troeger to insist that he "give[] himself to a

higher power" (*id.* ¶¶ 80-81). He alleges also that JetBlue employees denied Troeger's requests

for non-religious treatment programs and expressed increased concern about his behavior as a

result of those requests (*id.* ¶¶ 87-92). And finally, he alleges that, upon his transfer to Fort

Lauderdale, his direct supervisor Mayers "did not like that Plaintiff was challenging the religious

aspect of the HIMS meetings" (*id.* ¶ 99); interfered with Troeger's medical clearance (*id.* ¶¶ 103-

104); and "looked shocked and disgusted that Plaintiff would openly discuss homosexuality and

immediately ended [a] meeting, motioning Plaintiff out of his office" (*id.* ¶ 106).

The Court concludes that Troeger has carried his low burden of plausibly alleging

discriminatory motivation under Title VII. His allegations of fact, to be taken as true at this

stage, depict a culture of anti-atheistic and anti-homosexuality that spanned multiple managers, as well as influenced decisions to report various aspects of Troeger's behavior to corporate higher-ups.  That "giv[es] rise to a plausible inference to discrimination." *Cf. Vega*, 801 F.3d at 87.  Though JetBlue argues that "Plaintiff does not assert any facts suggesting that there is any link between these alleged remarks and any adverse employment action that was actually made by a relevant JetBlue decision-maker" (JB Mem. at 24), the Court must draw plausible inferences in favor of Troeger.  That includes the inference that Petersen and Mayers played a role in his termination by disseminating information about Troeger throughout the company, including to those who made the termination decision.  And though JetBlue argues that "the Second Amended Complaint identifies an alternative, non-discriminatory explanation for Plaintiff's allegedly differential treatment, *i.e.*, JetBlue's reasonable belief that Plaintiff was abusing illegal drugs" (*Id.* at 25), that explanation is not relevant at this stage.  Accordingly, JetBlue's motion to dismiss is denied with respect to the first and fourth causes of action.[5]

### b.    Hostile Work Environment

As to the third cause of action for the maintenance of a hostile work environment in violation of Title VII, Troeger "must show that the harassment was sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Terry v. Ashcroft*, 336 F.3d 128, 147 (2d Cir. 2003) (quotation marks omitted) (quoting *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002)).  The standard is met where a plaintiff plausibly alleges that his workplace was "permeated with discriminatory intimidation,

---

[5] Troeger does not allege any reason that he was not paid on March 8, 2023, discriminatory or otherwise.  Because the termination claim is timely and a qualifying adverse employment action, Troeger need not rely on the failure to pay to proceed past the motion to dismiss.

ridicule, and insult." *Oncale*, 523 U.S. at 78 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "This test has objective and subjective elements: the misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive." *Alfano*, 294 F.3d at 374 (quoting *Harris*, 510 U.S. at 21).

Though plausibly alleging a hostile work environment typically requires showing a pattern of hostile conduct, "even a single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace." *Alfano*, 294 F.3d at 374. The Second Circuit has made clear that though "even a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment," *Richardson*, 180 F.3d at 437 (quotation marks omitted) (quoting *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1305 (2d Cir. 1995)), even offensive "comments, slurs, and jokes" ordinarily do not constitute a hostile work environment unless they are "more than a few isolated incidents of . . . enmity." *Compare id.* (quotation marks omitted) *with Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 62 (2d Cir. 1992).

Where the plaintiff alleges that a series of incidents constitutes a hostile work environment, as opposed to a single severe incident, the incidents "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997) (quoting *Kotcher*, 957 F.2d at 62). "Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." *Alfano*, 294 F.3d at 374. "Among the factors to consider when determining whether an environment is sufficiently hostile are 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably

interferes with an employee's work performance.'" *Terry*, 336 F.3d at 148 (quoting *Harris*, 510 U.S. at 23). The test ultimately requires an evaluation of "the totality of the circumstances," *Richardson*, 180 F.3d at 437, and while the standard is demanding, the Second Circuit has "repeatedly cautioned against setting the bar too high." *Terry*, 336 F.3d at 148. "The environment need not be 'unendurable' or 'intolerable.'" *Id.*

Here, Troeger does not allege any single incident that, on its own, is sufficiently severe to constitute a hostile work environment. Instead, he argues that "[t]he comments, acts and events" in the Second Amended Complaint "cannot be viewed in isolation," but instead "holistically and as a mosaic."[6] (Opp. to JB at 25.) Troeger's allegations, considered together and presumed true, satisfy the requirement at this stage. Troeger alleges that he was repeatedly and falsely accused of being an "addict" by his supervisors. (*See* SAC ¶¶ 62, 91.) He alleges that he was required to spend time across the country at a treatment facility for a condition he did not have. (SAC ¶ 173.) He alleges that Petersen shared with him "confidential medical information he had received from Cornerstone regarding an American Airlines pilot," raising the inference that JetBlue employees were accessing Troeger's private information through Cornerstone. (*Id.*

---

[6] JetBlue argues that "Plaintiff does not plausibly allege that any relevant JetBlue decision-maker harassed him, and has failed to plausibly allege a basis on which to impute the alleged misconduct of Mr. Petersen [or] Mr. Kingston." (JB Mem. at 27.) But Troeger alleges that Petersen was his supervisor, and that Kingston was a JetBlue employee and involved in the investigation and discipline of Troeger. (SAC ¶¶ 12, 27-28.) "An employer is presumptively liable for . . . harassment in violation of Title VII if the plaintiff was harassed not by a mere coworker but by someone with supervisory (or successively higher) authority over the plaintiff, although in certain circumstances an affirmative defense may be available." *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 182 (2d Cir. 2012). The affirmative defense requires the employer establish "(a) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998). JetBlue argues neither.

¶ 74.)  He alleges that, while at monthly meetings hosted by JetBlue, he was "forced to speak about his 'recovery' from a substance use he did not have and his submission to a higher power he did not believe in."  (*Id.* ¶ 79.)  He alleges that during at least one meeting, his supervisors loudly announced that they would need to speak to him alone afterwards, that another pilot "demanded to attend the meeting," and that Troeger was "harassed" for what Troeger "had 'going on'" and for having an attorney.  (*Id.* ¶ 91.)  And he alleges that at a later meeting, Petersen stated falsely, "in front of everyone," "Chad[,] you had meth in your system, you were out doing meth."  (*Id.* ¶ 92.)  Troeger alleges that this conduct occurred over two years, during which he had to "continually lie about whether he had a substance abuse disorder and his belief in God."  (*Id.* ¶ 93.)[7]

The totality of the circumstances alleged by Troeger constitute a plausible showing of a hostile work environment.  Like in *Terry* itself, Troeger's supervisors publicly accused him of egregious conduct—in that case, of "having a nervous breakdown" and making "threats against INS employees," *Terry*, 336 F.3d at 148—and in this case, of having an untreated meth addiction.  Moreover, repeatedly forcing Troeger to lie about his religious beliefs, and to falsely aver that he had an addiction, over the course of two years, was a "continuous and concerted" form of abuse.  Other courts have found required regular religious practice at work to constitute a hostile work environment.  *EEOC v. United Health Programs of Am., Inc.*, 213 F. Supp. 3d 377, 416-17 (E.D.N.Y. 2016); *EEOC v. Preferred Mgmt. Corp.*, 216 F. Supp. 2d 763, 837 (S.D. Ind. 2002); *Garcimonde-Fisher v. Area203 Mktg., LLC*, 105 F. Supp. 3d 825, 840-41 (E.D. Tenn.

---

[7] Troeger also alleges that Mayers "looked shocked and disgusted that Plaintiff would openly discuss homosexuality and immediately ended [a] meeting, motioning Plaintiff out of his office."  (SAC ¶ 106.)  That allegation is too unspecific and isolated to, on its own, constitute a hostile work environment.

2015); *but see Cook v. SyncStream Sols., LLC*, 417 F. Supp. 770, 776 (E.D. La. 2019) (holding that optional morning prayers did not constitute a hostile work environment for a nonadherent). The combination of repeated—and public—accusations of drug addiction in the workplace, coupled with mandatory religious affirmations that Troeger alleges were required to keep his job, are sufficient to "alter the working conditions of a reasonable employee." *Terry*, 336 F.3d at 149.

Finally, for the same reasons as stated with respect to the disparate treatment claim, Troeger "has alleged facts sufficient to allow a fact-finder to conclude that defendants' alleged hostility was based on a prohibited factor." *Cf. Terry*, 336 F.3d at 150. Accordingly, JetBlue's motion to dismiss is denied with respect to the third cause of action.

### c.    Retaliation

Title VII also makes actionable discrimination on the basis of "oppos[ing]" a practice that is illegal under the statute. 42 U.S.C. § 2000e-3(a). With respect to the second cause of action, to survive a motion to dismiss, a plaintiff claiming retaliation in violation of Title VII "need only give plausible support to the reduced prima facie requirements that arise under *McDonnell Douglas*." *Littlejohn*, 795 F.3d at 316. In the retaliation context, that means plausibly alleging "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Id.* (quoting *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010). No one disputes that Troeger has satisfied the first three elements—the third in the form of a complaint submitted to "JetBlue Human Resources and Crew Relations about discriminatory treatment based on Plaintiff's religious beliefs and sex" (SAC ¶ 159).

That leaves the causal connection requirement, which "can be shown either '(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar treatment; or (2) directly, through evidence of retaliatory animus directed at the plaintiff by the defendant.'" *Littlejohn*, 795 F.3d at 319 (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)).

Troeger's allegations do not clear the mark.  First, he does not allege that any adverse employment action "followed closely" after his complaint; in fact, the only actionable adverse employment action occurred nine months later, following several other intervening events, including: Troeger's missing a HIMS meeting (SAC ¶ 103); multiple phone calls with the AME's office (*id.* ¶ 104); a discussion initiated by Troeger with Mayers about the contents of the tablet that culminated in Mayers kicking Troeger out of his office (*id.* ¶¶ 105-06); a random drug screen (*id.* ¶ 107); an extended leave of absence for a coronavirus infection (*id.* ¶¶ 109-12); missing a scheduled flight resulting in a "dependability review" (*id.* ¶¶ 113-14); two flights in which Troeger had an allergic reaction, with one resulting in a diversion (*id.* ¶¶ 118-20); another random drug screening (*id.* ¶ 126); a third random drug screening, because JetBlue incorrectly believed Troeger had missed the second one (*id.* ¶ 127); another missed meeting (*id.* ¶ 130); a fourth drug test (*id.* ¶ 131); and a third missed meeting (*id.* ¶¶ 133-35).  The initial complaint and Troeger's ultimate termination are too attenuated—even drawing every reasonable inference in his favor—to support a claim for retaliation.  The same goes for his not receiving his pay on March 8, 2023.  And the only possible direct evidence of retaliation, Troeger's allegation that on February 22, 2020 "Petersen harassed Plaintiff over . . . why he had an attorney," is vague and occurred two years before the submission of the complaint.  (*See id.* ¶ 91.)

Because Troeger has not plausibly alleged that any adverse employment action was causally connected to his protected activity, JetBlue's motion to dismiss is granted with respect to the second cause of action.

### 2.    NYSHRL and NYCHRL

The remaining ten causes of action asserted against JetBlue and Petersen arise under NYSHRL and NYCHRL.  Those statutes impose a "less rigorous standard" on employment discrimination plaintiffs than does Title VII.  *See Reach v. Healthfirst, Inc.*, No. 23-CV-8085, 2024 WL 4493769, at *6 (Oct. 15, 2024).  Under the NYCHRL, Troeger need only plausibly allege "differential treatment—that [he was] treated 'less well'—because of discriminatory intent."  *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2013).  And for claims that accrued on or after October 11, 2019—as these did—the same standard applies under NYSHRL.  *See Arazi v. Cohen Bros. Reality Corp.*, No. 20-CV-8837, 2022 WL 912940, at *17 (S.D.N.Y. Mar. 28, 2022).

The Court has already concluded that Troeger ceased to be protected by the NYSHRL and NYCHRL upon his transfer to Fort Lauderdale in April 2022.  Thus, the March 2023 termination and failure to pay are not actionable under the state and local statutes.  The only remaining theory of employment discrimination available to Troeger is the hostile work environment he experienced while living and working in New York.  As to JetBlue, the motion to dismiss the NYSHRL and NYCHRL claims is denied, since the Court already permitted the same claim to proceed against Title VII's more rigorous standard.  Thus, the motion to dismiss is denied with respect to the sixth, seventh, and ninth causes of action; and, also, with respect to the eighth and tenth causes of action as asserted against JetBlue.  That leaves four remaining categories of claims: (a) the NYSHRL and NYCHRL sex and religious discrimination claims as asserted against Petersen; (b) the NYSHRL and NYCHRL retaliation claims asserted against

both defendants; (c) the NYSHRL and NYCHRL aiding and abetting claims asserted against

Petersen; and (d) the employer liability claim under NYCHRL asserted against JetBlue.  The

Court addresses each in turn.

### a. NYSHRL and NYCHRL Discrimination Claims Against Petersen

With respect to the NYSHRL and NYCHRL claims as asserted against Petersen, the

same legal standards apply; Troeger must allege that he was treated "less well" by Petersen due

to discriminatory intent.  *Mihalik*, 715 F.3d at 110.  That requires making a plausible showing

that the plaintiff was "treated less well than other employees 'at least in part for a discriminatory

reason.'"  *Reach*, 2024 WL 4493769, at *7 (quoting *Bohlinger v. Abbott Lab'ys Inc.*, 843 Fed.

App'x 374, 376 (2d Cir. 2021) (summary order)).  Despite the liberal standard, "the NYCHRL is

not a general civility code."  *Williams*, 61 F.4th at 69 (quotation marks omitted) (quoting

*Mihalik*, 715 F.3d at 110-11).

As to the hostile work environment claim, many of the allegations supporting Troeger's

Title VII claims are relevant.  First, he alleges that Petersen called him an "addict" and accused

him of "doing meth" in front of other employees.  (SAC ¶¶ 62, 92.)  Moreover, Petersen

allegedly threatened that Troeger would lose his job if he did not attend drug treatment against

Petersen's will, interfering directly with Petersen's ability to perform his work.  (*Id.* ¶ 32.)

Finally, Petersen led meetings in which Troeger was required to proclaim false religious beliefs

and a nonexistent drug addiction.  (*Id.* ¶ 79.)  At least one of those meetings took place on

September 9, 2021 (*id.* ¶ 89), within the limitations period, rendering Troeger's hostile work

environment claim timely under the NYSHRL and NYCHRL.  More than asking this Court to

enforce a "civility code" at Jet Blue, Troeger adequately alleges that he was treated "less well"

than were religious heterosexual employees.  (*See id.* ¶ 78.)

As to discriminatory intent, though Troeger has fewer allegations to draw upon against Petersen alone, he has still met his minimal burden at this stage.  For example, Petersen repeatedly confronted Troeger in the workplace about his viewing gay pornography without any company policy justification for doing so.  (*See* SAC ¶¶ 22, 24, 30; Opp. to Petersen at 15.) While there may have been nondiscriminatory reasons for Petersen's actions, it is a fair inference to draw from the Second Amended Complaint that Petersen continued to object to the online searches because he harbored animus toward Troeger's homosexuality.  That is especially the case where Petersen did not first seek to drug test Troeger upon Troeger's offer, but instead directed him straight to rehab—raising the possibility that it was Troeger's homosexuality, rather than potential drug use, that motivated the decision.  (*See* Opp. to Petersen at 15.)  And Petersen required Troeger to receive an evaluation and treatment from an organization allegedly opposed to homosexuality.  (SAC ¶¶ 32, 72-73.)  Again, one can infer from Troeger's allegations—as the Court must at this stage—that Petersen knew of Cornerstone's position on homosexuality and selected it at least in part for that reason.

The same goes for Troeger's religious discrimination claims.  In particular, he alleges that Petersen ran the meetings in which Troeger was required to affirm religious beliefs that he did not hold (*id.* ¶ 79), and that Petersen expressed concern upon Troeger's request for a nonreligious alternative (*id.* ¶ 91).  Those allegations, taken as true and construed in favor of Troeger, are sufficient to make out a plausible case that Troeger was treated less well "at least in part" because of his sexuality and atheism.  In other words, Petersen cannot demonstrate that discriminatory intent "played *no* role" in his treatment of Troeger.  *Cf. Williams*, 61 F.4th at 69 (brackets omitted).

Accordingly, the motions to dismiss are denied with respect to the eighth and tenth causes of action as asserted against Petersen.

> **b.**    **NYSHRL and NYCHRL Retaliation Claims Against Both Defendants**

Regarding the eleventh and twelfth causes of action for retaliation in violation of the NYSHRL and NYCHRL, Troeger "must show that [he] took an action opposing [his] employer's discrimination and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Mihalik*, 715 F.3d at 112 (citation omitted). The only protected activity in the Second Amended Complaint was the filing of a discrimination and harassment complaint on June 7, 2022. (SAC ¶¶ 101, 159.) As the Court has already concluded, at that time, Troeger was no longer protected by the NYSHRL or NYCHRL. Therefore, the motions to dismiss are granted with respect to the eleventh and twelfth causes of action.

> **c.**    **NYSHRL and NYCHRL Aiding and Abetting Claims Against Petersen**

As to the thirteenth and fourteenth causes of action for aiding and abetting, a plaintiff must make a plausible showing "that the defendant actually participated in the unlawful conduct of the principal actor." *Nezaj v. PS450 Bar & Rest.*, 719 F. Supp. 3d 318, 333 (S.D.N.Y. 2024) (cleaned up) (quoting *Feingold v. New York*, 366 F.3d 138, 158 (2d Cir. 2004)). Petersen's primary arguments for dismissal of the aiding and abetting claims are arguments that the Court has already rejected: namely, that Petersen did not treat Troeger "less well" or act in part because of discriminatory intent. (*See* Petersen Mem. at 28-30.) Because Troeger has plausibly alleged that Petersen was involved in creating a hostile culture to which Troeger was subjected, including sending him to allegedly unnecessary treatment, forcing him to make religious statements, and calling him a meth user and "addict" with and around others, Troeger has carried his burden to survive the motion to dismiss the aiding and abetting claims. Petersen is correct,

however, that Troeger does not allege that Petersen had any role in Troeger's termination (Petersen Mem. at 30)—which is not actionable in any event because it occurred after Troeger lost the protection of the NYSHRL and NYCHRL, *see supra*.

Petersen's motion to dismiss is denied with respect to the thirteenth and fourteenth causes of action.

### d.    NYCHRL Employer Liability Against JetBlue

Troeger's fifteenth cause of action is asserted derivatively against JetBlue for the actions of Petersen and Mayers under New York City Administrative Code § 8-107(3).  (SAC ¶¶ 293-94.)  JetBlue does not make specific arguments to dismiss the fifteenth cause of action.  The claim is thus preserved, subject to the timeliness and geographic limitations already discussed in this opinion.

### E.    Venue Transfer

Finally, JetBlue—but not Petersen—argues in the alternative for this action to be transferred to the United States District Court for the Southern District of Florida, citing 28 U.S.C. § 1404.  (*See* JB Mem. at 31-32.)  Though JetBlue does not indicate the part of the venue statute on which it purports to rely, its arguments appear tailored to subsection 1404(a), which provides:

> For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented.

28 U.S.C. § 1404(a).  Venue is permitted in the Southern District of Florida because an action under Title VII "may be brought in any judicial district in the State in which the unlawful employment practice is alleged to have been committed," 42 U.S.C. § 2000e-5(f)(3), and Troeger alleges unlawful employment practices that took place in Fort Lauderdale.  However, to permit transfer under 28 U.S.C. § 1404(a), the transferee district must be able to exercise personal

jurisdiction over all defendants in the case. *Hoffman v. Blaski*, 363 U.S. 335, 342-43 (1960). That is the case even if the defendant over which the transferee court cannot exercise personal jurisdiction consents to the transfer, *id.* at 343-44; though, in this case, it does not appear that Petersen has consented. (*See* Petersen Mem.) Because JetBlue has not argued that Petersen is amenable to personal jurisdiction in Florida, the motion is denied.

## III. Conclusion

For the foregoing reasons, JetBlue's and Petersen's motions to dismiss the Second Amended Complaint are GRANTED in part and DENIED in part. The motions are granted with respect to the second, fifth, eleventh, and twelfth causes of action and denied with respect to the remaining causes of action. The motion to transfer venue is DENIED.

Defendant shall file an answer to the remaining claims within 14 days after the date of this opinion and order. *See* Fed. R. Civ. P. 12(a)(4)(A).

The parties are directed to file a proposed case management plan within 14 days consistent with this Court's Individual Rules.

The Clerk of Court is directed to close the motions at ECF Nos. 29, 40, and 43.

SO ORDERED.

Dated: December 17, 2024
New York, New York

_____
J. PAUL OETKEN
United States District Judge